THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK GRIFFIN, Defendant-Appellant.

First District (5th Division)   No. 84—1925

Opinion filed September 16, 1988.

Randolph N. Stone, Public Defender, of Chicago (Karen A. Popek, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Christopher J. Cummings, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Defendant, Patrick "Buddy" Griffin, appeals his conviction for the aggravated battery and attempted murder of Vernon Davis and his sentence of 15 years of imprisonment. We affirm.

Defendant was arrested on May 14, 1983, for the shooting of Vernon Davis and charged with attempted murder, two counts of aggravated battery, aggravated kidnapping and three counts of armed violence. On July 26, 1983, defendant was found unfit to stand trial and was committed to the Illinois Department of Mental Health.

On April 19, 1984, seven days before the expiration of the 120 days within which the State was obligated to try the defendant, the State filed a motion for an extension of time within which to try the defendant under section 103—5(c) of the Code of Criminal Procedure of 1963 (the Speedy Trial Act) (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(c)), and a motion to have the victim, Davis, certified as a material witness so that Davis could be released from the Los Angeles county jail and returned to Chicago. The trial court granted the State a 20-day extension to produce the victim. Following a bench trial, on July 9, 1984, defendant was found guilty of attempted murder and two counts of aggravated battery. The trial testimony follows.

The victim, Davis, testified on behalf of the State, that on May 14, 1983, he lived at 4442 King Drive in Chicago and that defendant lived and was his landlord at that address. Davis testified that defendant came to his door at 1:30 p.m. on that date and asked him for help in moving a stove in the basement. When Davis arrived in the basement defendant stood behind him with a gun. Davis questioned defendant about the gun and defendant accused Davis of stealing his jewelry. Davis denied having defendant's jewelry, and defendant shot him in the leg and threatened to kill him if his jewelry was not returned. Davis testified further that defendant told him that a girl had informed him that Davis had stolen his jewelry, but that because the girl was dead the story could not be confirmed. Defendant bound Davis' hands and feet behind his back and carried him to another room in the basement, where he threatened to shoot Davis again if he did not give him the jewelry. Davis told defendant to go to Davis'

apartment and look for the jewelry. Defendant called Davis a liar and again threatened to kill him. Davis testified that he told defendant to call defendant's son, Steven Raybourn. Before going up the stairs, defendant shot Davis again in the back of his neck. Defendant remained upstairs for approximately 15 minutes, returned to the basement and shot Davis behind the right ear. Defendant told Davis that he loved him like a son and that he did not understand why he had stolen his jewelry. Davis testified that he asked defendant to let him go out of deference to the friendship between Davis and Griffin's son, Steven Raybourn. Defendant responded by shooting Davis on the other side of his head, after which defendant reloaded the gun and fired several shots into the ceiling while he muttered to himself that it was taking a lot of bullets to kill Davis, that something was wrong with the gun and that he was going to call his son. Defendant hit Davis on the back of his head with a blunt object and went back upstairs.

While defendant was gone, Davis testified, Davis managed to get up and find some scissors in the basement which he used to cut the ropes from his feet. Davis managed to escape from the basement and went to one of the tenants in the building, but the tenant refused to help him. Davis went to the apartment of another tenant in the building, Herbert Kanard, and told Kanard that Buddy, defendant, had shot him. Kanard untied the ropes on Davis' hands and gave him a key to the deadbolt locks on the front door of the apartment building so that Davis could get out. Davis ran down the street and flagged a police officer. The police officer took Davis to a hospital where he was treated for gunshot wounds and released three days later. Davis added that the ropes with which defendant tied him up caused burns and marks on his ankles and wrists.

Davis testified that he had previously been convicted of robbery, for which he received three years' probation, and that he was also convicted twice in California for possession of marijuana. California revoked Davis' probation because he left California while still on probation. Davis testified that he had been imprisoned in California for violating the terms of his probation, but that he had received an early release in order to testify at the trial in the instant case. The Cook County State's Attorney's office paid Davis' airplane fare back to Chicago and other expenses. Davis added that he always paid his rent at 4442 King Drive in full and when it was due.

Steven Raybourn testified, on behalf of the State, that at approximately 1:30 p.m. on May 14, 1983, he received a telephone call from his father, defendant Griffin. Defendant told Raybourn to come to

4442 King Drive and to bring his gun because he needed a witness because he had the person, but that he did not know what to do with him. Raybourn testified that he received another call from defendant shortly after and that defendant stated, "Blow the horn, Stan," meaning to drop everything and come over because of an emergency. Defendant told Raybourn not to bring the gun because he did not need it anymore. Raybourn stated that he was a friend of Davis.

The next witness to testify on behalf of the State was Chicago police officer Gerald Johnson. Johnson testified that on May 14, 1983, he was in uniform and working on patrol without a partner. Johnson testified that at approximately 4:50 p.m. on May 14, 1983, he was driving northbound on King Drive when a man who was bleeding profusely and behaving erratically stopped him and told him that he had been shot several times. Johnson took Davis to a hospital. Davis told Johnson what had happened to him at the apartment building and gave him the key to the front door at 4442 King Drive. Johnson went to the apartment building, let himself in with the key and arrested defendant. Johnson testified that he found two nylon ropes and blood-stained mattresses in the basement of the apartment building.

Detective James O'Connell of the Chicago police department also testified on behalf of the State. O'Connell stated that he observed bloodstained mattresses, nylon ropes and part of a watch on the floor of the basement. O'Connell also recovered a .32 caliber revolver from the floor of the boiler room of the apartment building. O'Connell identified People's exhibit No. 9 as a photograph of a locker with "rubbers" on top of it which he had observed in the basement. When O'Connell returned to the apartment building on May 15, 1983, he found nine spent bullet casings, all of which were "embellowed," or expanded at the top, and two pellets inside these "rubbers." O'Connell testified that Davis had sustained bullet wounds to his right thigh, right hand, the base of his skull, the center of his head and above each ear, and abrasions on his wrists and ankles.

Herbert Kanard next testified on behalf of the State. Kanard stated that he lived at 4442 King Drive and that he knew the defendant only as "Buddy." On May 14, 1983, at approximately 2:30 p.m. or 3 p.m., Kanard was at home watching television, when he heard something fall against his door. When Kanard opened the door, he saw Davis, who was covered with blood. Davis told Kanard that Buddy had shot him and asked Kanard for help. Kanard testified that he untied Davis' hands and gave him the key to the front door of the apartment building so that Davis could get out.

Finally, the State presented the testimony of two witnesses by

way of stipulation. The testimony of Dr. Walsh, a physician at Provident Hospital, as set forth in the stipulation was that on May 14, 1983, Dr. Walsh admitted Vernon Davis to Provident Hospital, where he observed gunshot wounds to the middle of Davis' neck, behind each of his ears, in the back of his head and in his right thigh. The bullet in Davis' neck was surgically removed, but three other bullets were not removed. After three days Davis was released from the hospital.

The testimony of Ernest Warner of the ballistics section of the Chicago police department, as set forth in the stipulation, was that Warner observed the casings and pellets submitted to him by Detective O'Connell. Warner's opinion was that all of the casings were .32 caliber and were fired from an old gun. Warner also observed bellowing in the casings, which he opined occurred because the Colt .32 caliber casings were fired from a Smith and Wesson revolver with a slightly larger barrel. As the casings were fired, they expanded to fill the barrel of the revolver and therefore lost velocity, causing the pellets to move more slowly than their normal velocity when fired. Warner's statement further related that all of the casings were fired from the same gun and that five of the seven pellets submitted to him were fired from the same gun; the other two pellets were too mutilated to be suitable for comparison.

Defendant testified on his own behalf. Defendant testified that on the afternoon of May 14, 1983, he was painting the outer doors of the apartment building at 4442 King Drive, which he managed for his parents. Defendant testified that the victim, Davis, lived in the apartment building. Defendant testified that Davis had occasionally worked for him at the building and that Davis had not always paid his rent in full or when it was due. Defendant stated that he asked Davis to vacate the apartment because Davis had padlocked his apartment, thereby denying access to the landlord; because Davis did not pay his rent; and because there was a steady stream of people in and out of Davis' apartment. Defendant testified that these people frequented Davis' apartment in order to purchase "509" syrup for use with controlled substances, and because Davis' apartment was a "shooting gallery" where Davis allowed people to use his apartment to "shoot up" or inject narcotics. Defendant denied that he shot or tied up Davis. Defendant added that he was the only person known as "Buddy" at 4442 King Drive.

Defendant also testified that because Davis worked in the apartment building, Davis' rent was $55 per month; that defendant was not the only person in the building who collected the rent; and that it

was possible that defendant's brother had collected rent from Davis. Defendant denied that he owned a gun or that he showed his son, Steven Raybourn, a gun on May 9, 1983. Defendant further denied that he had ever had any rings stolen, that he had ever accused Davis of helping a girl who had stolen his rings to get out of the building; or that he had stated to Assistant State's Attorney Rupert that he had been robbed recently.

In rebuttal, the State called Steven Raybourn, who testified that defendant was his father, and that on May 9, 1983, when he was in the basement of his father's apartment building, his father showed him a .32 caliber revolver. Raybourn testified that at that time his father fired shots into a telephone book which was propped against the wall.

The State also called Detective O'Connell in rebuttal. O'Connell testified that he was present when Assistant State's Attorney Rupert interviewed defendant. In that interview, defendant told Rupert that he had been robbed a couple of days before the interview. The rest of Rupert's interview of defendant was offered by way of a stipulation that defendant denied any knowledge of the shooting of Davis; that defendant was at home on May 14, 1983; that Davis was a troublemaker who put himself in the position to be shot; and that defendant had been robbed recently.

On appeal, defendant contends that the State failed to show that it exercised due diligence in attempting to locate its witness, the victim, Vernon Davis, and that the trial court abused its discretion in granting the State an extension of the time within which the State was required to bring defendant to trial, and that the State thereby violated defendant's right to a speedy trial. We disagree.

On April 19, 1984, the State filed a motion, pursuant to the Illinois Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(c)), requesting a 60-day extension of the time within which the State was required to bring defendant to trial. The prosecutor stated that the State had, "after much effort," located the complaining witness, Vernon Davis, who was incarcerated in the Los Angeles County jail for a violation of probation. The prosecutor stated that the State had prepared a petition to have Davis certified as a material witness for the purpose of compelling Davis' attendance as a witness at trial. The prosecutor also informed the court that, of the 120-day speedy trial term, there were only seven days remaining, and that because the State was unable to produce Davis before the end of those seven days, the State needed an extension of the 120-day term. Counsel for defendant objected to an extension of the term on the ground

that the case had been set for trial four times previously and that the State had not shown that it had exercised due diligence in attempting to locate Davis. The trial judge granted the State an extension of 20 days within which to produce Davis.

■ Section 103—5(c) (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(c)) affords the trial court discretion to grant the State an extension of the 120-day term in which to bring a defendant accused of a crime to trial upon satisfaction of the following two-pronged test:

> "If the court determines that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day the court may continue the cause on application of the State for not more than an additional 60 days."

■ In arguing the motion to extend the term, the prosecutor merely made a conclusory claim that the State had located Davis "after much effort." Ordinarily, this showing by the State of due diligence in attempting to locate the complaining witness would be inadequate. However, for several reasons, this was an adequate showing by the State, under the unique circumstances in this case. First, counsel for the defense failed to articulate a basis for his objection that the State had not shown due diligence. Defense counsel objected to an extension of the term and the following colloquy between the court and defense counsel, in pertinent part, ensued:

> "[DEFENSE COUNSEL]: *** Judge, I don't think the State has shown due diligence.
>
> THE COURT: They have a problem.
>
> [DEFENSE COUNSEL]: The question is when did they find—the case was set for trial four times. My client has been in custody all the time. I think I would also indicate to you why not motion the case up and tell Your Honor that this man is incarcerated.
>
> THE COURT: Motion for Extension is sustained. The term is extended to 5/15.
>
> [DEFENSE COUNSEL]: We persist in our demand for trial."

Counsel for the defense therefore did not adequately raise the issue of the State's lack of due diligence in the trial court and is precluded from raising it on appeal. (*Shell Oil Co. v. Department of Revenue* (1983), 95 Ill. 2d 541, 550.) Second, the victim in this case left the State, and the State sought and later discovered that the victim was in the Los Angeles County, California, jail. It does not appear that the

State delayed seeking the victim's prompt removal from California and return to Illinois for the defendant's trial. Third, the trial court granted the State only 20 of the 60 days of extension allowed under the statute within which to return the victim to Illinois and try the defendant. Fourth, following the 20-day extension at the State's request, the defense requested and was granted two additional continuances, further delaying defendant's trial by 18 additional days. Defendant therefore cannot convincingly complain because of the 20-day extension granted to the State. We hold that the trial court, under the aforementioned circumstances, did not err or abuse its discretion in granting the State's request for 20 additional days within which to try the defendant.

■ Defendant next contends that the trial court committed reversible error in admitting evidence and considering testimony that the victim had made prior out-of-court statements consistent with his trial testimony that defendant was his assailant. We disagree. The identification of defendant as Davis' assailant was not made an issue by defendant in the trial court. The issue simply was whether defendant shot Davis. Over the objections of defense counsel, the victim, Davis, and Kanard, another resident of the apartment building, testified that Davis told Kanard that defendant shot him. Police officer Johnson also testified that Davis told him that defendant had shot him. More importantly, Davis himself testified in court that defendant shot him, which was simply denied by the defendant. The trial judge thus had adequate, unquestionably admissible in-court testimony from which to determine that defendant shot Davis. Without deciding whether the testimony of Kanard and Johnson that Davis told them that defendant shot him was admissible as the victim's spontaneous declarations or outcries, even if the testimony was inadmissible, the error was certainly harmless within the factual posture of this case. Error in the admission of hearsay is harmless where such testimony is merely cumulative. (*People v. Cihlar* (1982), 106 Ill. App. 3d 824, 830, 436 N.E.2d 1041.) Considering the other evidence against defendant, it is clear beyond a reasonable doubt that he would have been convicted even absent this testimony of Kanard and Johnson. *People v. Curtis* (1986), 113 Ill. 2d 136, 153.

■ Defendant lastly contends that his sentence of 15 years was excessive and should be reduced because his only prior felony conviction occurred in 1957; because defendant suffered psychiatric problems; and because Davis did not suffer severe or permanent injury from the shooting. We disagree. Attempted murder is a Class X felony carrying with it a sentence of not less than 6 years' and not more

than 30 years' imprisonment. Defendant's sentence is well within the statutorily imposed sentencing guidelines. When the trial court imposes a sentence which is within the statutory limits, it will not be altered on appeal absent an abuse of discretion by the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) Further, the Illinois constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11.) We find no basis within the circumstances of this case upon which to conclude that the trial court abused its discretion in sentencing defendant. Quite the contrary, when viewed in light of the heinous, willful, wanton, vicious and malicious acts which defendant perpetrated against his victim, the sentence of the trial court may be considered to be perhaps lenient.

The judgment of the trial court is affirmed.

Affirmed.

LORENZ, P.J., and SULLIVAN, J., concur.