THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHN McCARTNEY, Defendant-Appellant.

First District (3rd Division) No. 1—88—3361

Opinion filed November 14, 1990.

Sheldon L. Banks, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Gale O'Brien, and LaTisha Martin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, John McCartney, was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1)) and sentenced to 30 years' imprisonment in the Illinois Department of Corrections. Defendant appeals, contending that: (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court erroneously permitted impeachment of his alibi witnesses; (3) the trial court abused its discretion in denying his motion for a new trial; and (4) the trial court abused its discretion in imposing the sentence. We affirm.

T.O., the seven-year-old complainant, testified as follows: On April 8, 1988, he and his playmate were riding their bicycles down Washtenaw and Talman Avenues. T.O. saw a yellow truck parked on Thorndale. A white male, dressed in a pink and white striped sweat shirt and blue jeans, got out of the truck. T.O. described the man as tall and about as big as his dad and that he had a scratch over his right eye on his forehead. T.O. and the man walked into a gangway together.

After they went into the gangway the man pulled down his pants and began shaking his "ding dong." T.O. indicated on his body that

the man's "ding dong" was located between his legs. The man then pulled down T.O.'s pants and licked his "ding dong." When the man finished, he said good-bye to T.O. and told him not to tell his mother. T.O. pulled up his pants, went home, put away his bicycle, and immediately told his mother what had happened.

A few days after the incident T.O., accompanied by his father, went to the police department to look at a photo array. He testified that when he first saw defendant's photograph at the police department he initially said to his dad, and then to the police, "that's him."

A few days afterwards, T.O., again accompanied by his father, returned to the police station to view a lineup. He identified defendant as his assailant.

On cross-examination T.O. testified that his playmate was not with him at the time of the assault, but had returned to T.O.'s house. Further, in response to defense counsel's question that T.O. had not told his mother immediately, but had waited a couple of hours instead, T.O. responded, "Yes." T.O. also testified that there was something different about the hair and muscles of the man in the photograph.

T.O's mother, A.O., testified. Her testimony essentially corroborated T.O.'s, except she stated that on the morning of the 8th, T.O. returned home from riding his bicycle at about 10 a.m. He told her about the incident almost immediately upon his arrival. However, they had not called the police until about 1½ hours later. T.O. was crying and upset, and he told her that "some man licked [his] ding dong." T.O. was six years old when the incident occurred.

M.O., T.O.'s father, also testified. He was with T.O. when he looked at the photo array. When T.O. identified defendant in the photograph book, M.O. summoned Detective Carey Orr, who was conducting the photo identification. According to M.O., Detective Orr asked T.O. why he thought the man in the photo he had chosen was his assailant. T.O. responded because it looked like him, that he had the same color hair, even though it was a little different, and that he had big muscles. At Detective Orr's instruction, T.O. looked through the rest of the photo array; however, he made no other identifications. Detective Orr's testimony concerning the photo identification essentially corroborated that of M.O.

M.O. further testified that when he and T.O. went into the police station for the lineup, after the blinds to the viewing window were opened, T.O. immediately identified defendant and stated, "There he is, dad. There he is." On redirect examination, M.O. stated that neither he nor anyone else had suggested to T.O. who to pick out in either the photo array or the lineup. Detective Warren Gavin, the offi-

cer who conducted the lineup, corroborated M.O.'s testimony.

Officer Barbara Bereckis, a Chicago police officer, testified that on April 8, at about 11:58 a.m., she interviewed T.O. at his home. According to her, T.O. identified his assailant as a white male, approximately 30 years old, dark brown hair, with a scratch on the right side of his face, on his forehead.

On cross-examination, Officer Bereckis stated that she heard T.O.'s parents tell another officer that T.O. had not told them about the incident until a few hours after he had arrived home. When questioned about T.O.'s description of defendant's truck, Bereckis initially stated that the "[c]losest we could come was yellow." She then stated that T.O. had told her yellow.

Recitation of the testimony of other State witnesses, which was largely corroborative, would only be cumulative. Therefore, their testimony will only be stated where required to adequately address defendant's arguments.

Jean Gibson, defendant's mother, testified on defendant's behalf. On April 8, 1988, she was at home. According to her, at 9:30 a.m., defendant, her daughter, Gina McCartney, and their friend, Terry Dean, came into the house. Defendant was dressed in a suit at the time. Defendant slept there with his girlfriend, Tracy Walsh, the rest of the day. At 6 p.m. that evening defendant and Walsh left the home. Walsh corroborated Jean's testimony concerning defendant's presence in the home on April 8.

Eunice Mosco, a friend of Jean's, also testified on defendant's behalf. She stated that on Friday, April 8, 1988, at about 9:15 a.m., she saw defendant and his sister in a red car at a local gas station located at "Devon and Bell." Mosco went to the passenger side of the car, stuck her head inside and said hello. When asked whether she saw the scratch on defendant's face, she responded that she was not looking at him in that way.

Patricia Boyd, Mosco's sister, essentially corroborated Mosco's testimony, with the exception of the fact that Boyd stated that she usually works on Saturdays and that it was a Saturday when she and Mosco had seen defendant at the station.

Gina McCartney also testified. She stated that on the evening of April 7, defendant and a friend, Terry Dean, came into the bar where she works and stayed until the 2 a.m. closing. Afterwards, she, defendant, and Dean went to a couple of other bars. On the morning of April 8, at about 8:30 a.m., the three headed for home. On the way, they stopped at a gas station on "Devon and Belmont." When she got out of the car to get cigarettes, she saw Eunice go over to the car

and speak to defendant. Gina returned to the car and the three then went to her mother's home. According to Gina, they arrived home at about 9:10 a.m. William Dean[1] corroborated Gina's testimony.

Defendant's first contention raises a question of sufficiency of the evidence at trial. He maintains that he was not proved guilty beyond a reasonable doubt, and he urges several points in support of reversal. We disagree.

■■ "Allegations of sexual misconduct are easily made, hard to prove, and harder to defend." (*People v. Douglas* (1989), 183 Ill. App. 3d 241, 251, 538 N.E.2d 1335, citing *People v. Nunes* (1964), 30 Ill. 2d 143, 195 N.E.2d 706.) Accordingly, in order to sustain a conviction for aggravated criminal sexual assault where the defendant denies the charge, the testimony of the complainant must be either clear and convincing or corroborated by other evidence. *People v. Cregar* (1988), 172 Ill. App. 3d 807, 819, 526 N.E.2d 1376; *People v. Server* (1986), 148 Ill. App. 3d 888, 894, 499 N.E.2d 1019, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131.

■ There is no requirement that testimony be crystal clear and perfect in order to qualify as clear and convincing. (*People v. Born* (1987), 156 Ill. App. 3d 584, 590, 509 N.E.2d 125; *Server*, 148 Ill. App. 3d 888, 499 N.E.2d 1019.) Minor variances affect only credibility (*Cregar*, 172 Ill. App. 3d at 820, citing *People v. Redman* (1986), 141 Ill. App. 3d 691, 490 N.E.2d 958), a factor properly left for resolution by the trier of fact (*Cregar*, 172 Ill. App. 3d at 820). As long as any discrepancies do not detract from the reasonableness of the complainant's testimony, it may be held to be clear and convincing. (*Redman*, 141 Ill. App. 3d at 703.) Needless to say, our review of the trial court's judgment will not be set aside unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to the defendant's guilt. *People v. Johnson* (1986), 114 Ill. 2d 170, 190, 499 N.E.2d 1355, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618; *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.

Defendant first argues that T.O.'s testimony concerning his height and weight was unclear. He points to testimony that T.O. told one police officer that his assailant was about 30 years old while he told another that he was between 30 and 40. Additionally, defendant points to a police officer's testimony that T.O. had not been clear about

---

[1]William Dean is referred to in Jean Gibson's and Gina McCartney's testimony as Terry Dean.

defendant's height, while he told another officer that defendant was six feet tall.

■ We notice no unclarity in this testimony. Further, we decline to consider the officer's testimony concerning T.O.'s lack of clarity in description as impeachment testimony. T.O.'s identification of defendant in the photo array, the lineup, as well as in court, was immediate and certain. Moreover, the presence of discrepancies or omissions in a witness' description of the accused do not, in and of themselves, give rise to a reasonable doubt as long as a positive identification has been made. *People v. Slim* (1989), 127 Ill. 2d 302, 309, 537 N.E.2d 317; *People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915.

Defendant has raised a few other points regarding matters of fact and issues of credibility concerning T.O.'s identification of him as the offender. We have considered these issues, and we believe them to have been properly resolved by the trial court. Additional recitation and analysis of these issues would serve no purpose and we therefore decline to consider them further.

Defendant next argues that the lineup identification is not reliable because of M.O.'s suggestive comment to T.O. prior to his viewing the lineup. Specifically, defendant asserts that when T.O. went to the police station to view the lineup, his father told him that there was going to "be a man that looked like the picture" that T.O. had earlier identified.

Our review of the record reveals that on cross-examination of T.O., the following colloquy occurred:

"MR. BANKS [Defense Counsel]: [T.O.], when you went with your dad to the line-up, do you remember?

WITNESS: Yes.

MR. BANKS: Okay. And before you went to the line-up, your dad said there was going to be a man who looked like the picture that you picked out was going to be in the line-up, is that correct?

WITNESS: Yes."

■ Cross-examination is a legal tool, which, when skillfully applied, may involve the use of many subtleties in questioning designed to elicit the truth. A witness, such as T.O., of tender years, who is otherwise oblivious to the techniques applied in the art of advocacy, may be incapable of distinguishing such nuances and to adequately avoid the traps set thereby. We decline to credit T.O. with defense counsel's artfully designed question. Moreover, T.O.'s father testified that he had not made such a statement prior to T.O. viewing the lineup.

Defendant next argues that T.O.'s identification of defendant's truck was uncertain. He points to the following facts: (1) T.O. testified that he had told the policemen that the truck was yellow, (2) T.O. described to a police officer that the truck was a yellow pick-up, and (3) the McCartney truck was a dump truck which was described by various witnesses as green, gray and yellow; green and gold; and gray and green.

Officer Carl Kurth testified that he had taken a photograph of defendant's father's truck. On the day following the lineup, he showed that picture, along with four others, to T.O. for identification. T.O. chose the photograph of the McCartney truck and was asked to write his name on it.

On direct examination T.O stated that when he was shown the photographs of the trucks, he recognized the truck that had been parked on the street on the date of the incident. He stated, "That's it," and wrote his name on the picture. On cross-examination T.O. stated that in the initial interview with the police he told them that the truck was yellow. While testifying, when shown a photograph of the truck which he had previously identified and asked to describe its color, T.O. replied, "all sorts of colors. Blue. White. Any color." Then, when asked whether the truck contained any yellow, T.O. replied that he did not see any, but identified some yellow on the license plate.

Detective Anthony Villardita testified that T.O. had initially described the truck as a type of a pick-up truck, but that the back was different; it was open similar to a pick-up truck. On cross-examination, Villardita testified that T.O. never used the words pick-up truck, but from his description, that's how Villardita would describe it. Villardita put in his police report that defendant was in a yellow pick-up truck.

■ Even though T.O.'s identification of the color of the truck is less than perfect, his identification of the McCartney truck in the photograph was clear. We do not believe that minor discrepancies concerning the color of the truck detract from the reasonableness of T.O.'s testimony. This is particularly so in light of the fact that even defendant's own witness described the truck as having some yellow on it.

■ Finally, defendant maintains that T.O.'s testimony was dubious and uncertain in contrast to the uncontradicted testimony of his six alibi witnesses and that the trial court erred in rejecting it. He relies on *People v. Jefferson* (1962), 24 Ill. 2d 398, 182 N.E.2d 1, for the proposition that where there is uncontradicted alibi testimony, uncertain identification testimony is insufficient to support a conviction.

We agree, however, as we have already discussed, T.O.'s identification testimony was not uncertain. Furthermore, the weight afforded alibi testimony is a question of credibility for the trial court (*People v. Calhoun* (1984), 126 Ill. App. 3d 727, 738, 467 N.E.2d 1037; *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847), and there is no requirement that it accept alibi testimony over positive identification of an accused. *Slim*, 127 Ill. 2d at 315; *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649.

Furthermore, we find defendant's reliance on *Jefferson* to be of no benefit to him. We note that in *Jefferson*, while one of the alibi witnesses was the defendant's aunt, the other was a disinterested person who also claimed to have committed the offense for which the defendant was charged. Additionally, the complainant in *Jefferson* was unable to identify the defendant as the offender even though he had the best opportunity to observe him. Here, the defendant's alibi witnesses were, for the most part, either relatives or friends of the family. Additionally, here, unlike *Jefferson*, the complainant was able to identity defendant as his assailant.

■ After reviewing all of the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of aggravated criminal sexual assault beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, *cert. denied* (1990), ___ U.S. ___, 111 L. Ed. 2d 798, 110 S. Ct. 3290; *Collins*, 106 Ill. 2d 237.) T.O.'s testimony concerning the assault was clear and convincing. The guilty verdict is amply supported by the evidence and must stand.

Defendant's second contention, raised in his supplemental brief, is that reversal is required because the trial court erroneously relied on *People v. James* (1988), 123 Ill. 2d 523, 528 N.E.2d 723, to permit impeachment of his alibi witnesses.[2]

At trial, after the defense had presented several alibi witnesses, and over defendant's objection, the State presented rebuttal testimony of two police officers. Officers Gavin and Kurth testified that following the lineup, defendant asked them what happened. The officers replied that defendant had been identified. Defendant then responded that it could not have been him because he was working with

---

[2]Defendant refers to the officers' testimony as impeachment evidence. Impeachment evidence is a prior contradictory statement of the witness. Since the statement here was not that of the officers, but rather of defendant, we believe that the testimony, correctly characterized, was rebuttal evidence, substantive evidence introduced to contradict a specific point in the defendant's case. See *People v. James*, 123 Ill. 2d at 548-50 (Clark, J., dissenting, joined by Stamos, J.).

his father at the time of the incident. We note, without need of detailed analysis, that defendant's response to the police officers, which was freely and voluntarily given, was legally obtained evidence.

John McCartney, defendant's father, testified that defendant occasionally works for him in his construction business. On surrebuttal, John testified that defendant worked four days of the week beginning April 4, but that he did not work on April 8.

McCartney also testified that on the morning of the 8th, at about 8:30 a.m. he and another employee went in John's station wagon to a jobsite. His truck, which he described as green and gold, was left parked on Leavitt. After going to the jobsite, he checked back at about 10 a.m. and found that the truck was still parked there. John further testified that defendant used to have a key to the truck, but, sometime prior to April 8, John had taken the key from him.

In *James*, our supreme court held that illegally obtained evidence could be used to impeach, not only the defendant's testimony, but testimony of his witnesses. The U.S. Supreme Court reversed, holding that expansion of the exception "to encompass the testimony of all defense witnesses would not further the truthseeking value with equal force but would appreciably undermine the deterrent effect of the exclusionary rule." *James v. Illinois* (1990), 493 U.S. 307, 320, 107 L. Ed. 2d 676, 688, 110 S. Ct. 648, 656.

■ Defendant relies on the latter holding to support his argument of impropriety of the rebuttal testimony. *James* is of no avail to defendant. The narrow holding of *James* is that illegally obtained evidence cannot be used to impeach the defendant's witnesses. The rebuttal evidence in this case was legally obtained. Further, even though defendant chose not to testify, the rebuttal evidence was properly admitted to contradict the defense witnesses on defendant's alibi defense and reflected adversely upon the credibility of those witnesses. See *People v. Newsome* (1982), 110 Ill. App. 3d 1043, 443 N.E.2d 634, *cert. denied* (1983), 464 U.S. 934, 78 L. Ed. 2d 308, 104 S. Ct. 340; *People v. Harvey* (1980), 92 Ill. App. 3d 465, 415 N.E.2d 1161; *People v. Green* (1975), 26 Ill. App. 3d 662, 325 N.E.2d 316, *aff'd in part, rev'd in part on other grounds* (1975), 62 Ill. 2d 146, 340 N.E.2d 9, *cert. denied* (1976), 426 U.S. 925, 49 L. Ed. 2d 379, 96 S. Ct. 2635.

■ To the extent that the trial court relied on *James* as the basis for its allowance of the rebuttal testimony, it was in error. That notwithstanding, " 'the question before a reviewing court is the correctness of the result reached by the trial court, and not the correctness of the reasoning upon which that result was reached.' " (*People v.*

*Thompkins* (1988), 121 Ill. 2d 401, 428, 521 N.E.2d 38, *cert. denied* (1988), 488 U.S. 871, 102 L. Ed. 2d 156, 109 S. Ct. 187, quoting *People v. York* (1963), 29 Ill. 2d 68, 71, 193 N.E.2d 773; *People v. Romero* (1975), 31 Ill. App. 3d 704, 334 N.E.2d 305, *aff'd* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.) The testimony was properly allowed; we find no abuse of discretion.

Defendant's third contention is that the trial court abused its discretion when it denied his motion for a new trial. Prior to sentencing, defendant filed and argued a motion for a new trial based on newly discovered evidence. The claimed new evidence was a letter which, subsequent to the jury's verdict, had been mailed to the Lerner Newspaper. In the letter the writer, who described himself as a "child molester [who] needs to be stopped," stated that he had sexually assaulted T.O. and that "[defendant] didn't do it." After hearing defendant's argument, the trial court denied the motion for a new trial.

 Motions for a new trial based on newly discovered evidence are left to the sound discretion of the trial court, and absent an abuse of discretion, its decision will not be disturbed. (*People v. Miller* (1980), 79 Ill. 2d 454, 464, 404 N.E.2d 199, citing *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1; *People v. Johnson* (1986), 148 Ill. App. 3d 163, 498 N.E.2d 816.) Since newly discovered evidence is regarded with suspicion, applications for new trials on that basis are likewise looked upon with distrust and must be granted with great caution. (*Miller*, 79 Ill. 2d at 465.) However, a new trial will be granted more readily where the verdict appears to be against the weight of the evidence or where it is quite doubtful under the evidence. 66 C.J.S. *New Trial* §110 (1950).

In order for newly discovered evidence to warrant a new trial, the new evidence must meet three requirements. It must (1) be of such conclusive character that it will probably change the result on retrial, (2) have been discovered since the trial, and (3) be of such character that it could not have been discovered prior to trial by the exercise of due diligence. *People v. Molstad* (1984), 101 Ill. 2d 128, 134, 461 N.E.2d 398; *Baker*, 16 Ill. 2d 364, 158 N.E.2d 1.

The State concedes, and we agree, that defendant's claimed new evidence satisfies the second and third requirements for a new trial. The more difficult question is whether the letter would probably result in acquittal in the event of a new trial. In the letter, which was dated four days after the jury's verdict, the writer states that he wants to be caught, yet, he includes neither a legible name nor an address. However, he then goes on to include a physical description of

himself, *viz.*, that he had a scar on his forehead, that his hair is blondish brown and that he drives a "yellow pick-up truck." We are wary of the writer's choice of facts which, coincidentally, attempt to mirror T.O.'s identification testimony. The timing of this letter, in addition to the writer's choice of facts, which incidentally go to the contested issue of identification, tend, to us, to cloak the letter in a veil of suspicion.

■■ Our resolution of this issue involved consideration of the letter itself as well as our determination that the verdict here was amply supported by the evidence. We are not persuaded that this letter, which could easily have been contrived by defendant, would have resulted in a different result upon retrial. Therefore, we find no abuse of discretion in the trial court's denial of defendant's motion for a new trial.

Defendant's final contention is that the trial court abused its discretion in sentencing him to a term of 30 years' imprisonment. He argues that the trial court failed to consider his potential for rehabilitation. He maintains that even though the trial court stated that it was aware of the court's obligation to consider the likelihood of rehabilitation, it made only findings in aggravation.

We have reviewed that portion of the record wherein the court pronounced sentence. The court, contrary to defendant's characterization, expressly stated:

> "This court has had the opportunity to listen to the arguments in aggravation and mitigation. I have considered those, each of those factors as I felt were applicable, as well I recall the facts of this case very, very well. I have again had the benefit of arguments of both very able counsel. I have read the presentence investigation as well as the victim-impact statement that's incorporated therein.
>
> *** I'm certainly conversant with our 1970 Illinois Constitution particularly article 1, [s]ection 11 that essentially indicates all penalties should be determined both according to the seriousness of the offense and with the objective to restore the offender to useful citizenship."

The court's express statements belie any argument that it failed to give consideration to the appropriate sentencing factors. Moreover, the sentencing judge need not recite every factor he considered in determining defendant's sentence. *People v. Plantinga* (1985), 132 Ill. App. 3d 512, 522-23, 477 N.E.2d 1299; *People v. Davis* (1984), 124 Ill. App. 3d 813, 464 N.E.2d 1150.

We also note that aggravated criminal sexual assault is a Class X

felony (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(c)), punishable by a term of imprisonment of not less than 6 years and not more than 30 years (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3)). Thus, defendant's sentence was within the statutory limits.

 It is well settled that matters of sentencing rest within the sound discretion of the trial court and, absent a finding of abuse, this court will not substitute its judgment. (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541; *People v. Griffin* (1988), 175 Ill. App. 3d 111, 529 N.E.2d 727.) In reviewing sentencing issues, we are mindful that it is not our function to serve as a sentencing court. (*People v. Sheppard* (1990), 193 Ill. App. 3d 401, 405, 549 N.E.2d 971; *People v. Holloway* (1983), 119 Ill. App. 3d 1014, 457 N.E.2d 466.) Therefore, that we, as a reviewing court, might have imposed a lesser punishment for an offense is not cause for reduction of a statutorily permissible sentence. *People v. Perruquet* (1977), 68 Ill. 2d 149, 156, 368 N.E.2d 882.

 Here, the trial court had before it defendant's past criminal record, which not only included a 1982 conviction and four-year prison sentence for aggravated kidnapping of a child, but chronicled a history of deviant sexual and antisocial behavior. The court also had the opportunity to consider defendant's age, past military service, character and demeanor, as well as the victim impact statement. We have reviewed the factors presented to the trial court and have given much consideration to the nature and circumstances of this offense. Additionally, we have given attention to the proximity in time between defendant's 1982 conviction and this offense. We agree with the court's assessment of defendant as a "threat to children." Therefore, in light of all of these factors and in deference to those settled principles of law which we have recited above, we can find no abuse of discretion. Defendant's sentence was proper.

For the foregoing reasons, we affirm the judgment and sentence of the trial court.

Affirmed.

CERDA, P.J., and WHITE, J., concur.