THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FAR-NARDO ANDERSON, Defendant-Appellant.

First District (4th Division)    No. 1—93—1940

Opinion filed October 26, 1995.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

A jury found the defendant, Farnardo Anderson, guilty of first-

degree murder, for which he was sentenced to 39 years' imprisonment. On appeal, he contends that (1) the court erred in refusing to suppress his confession; (2) he was denied effective assistance of counsel because his attorney failed to learn prior to trial that he had a history of mental illness; (3) he was entitled to a new trial because his counsel could not reasonably have learned of his mental illness until after trial; (4) he was denied a fair trial by the prosecutor's cross-examination, which was intended to inform the jury that the defendant had been released from prison immediately before trial; and (5) his sentence was an abuse of discretion.

On November 16, 1990, about 5 p.m., the decedent, Charles Brown, was shot to death in the vicinity of eastern Lawrence Avenue in Chicago. The decedent was standing among a group of men when two other young men, the defendant and Silas Barnes, approached and opened fire, striking and killing the decedent. The defendant's case proceeded to trial separately before a jury.

The State presented the testimony of several members of the decedent's gang, including Nick Sanders, Brian Richardson, Lavelle Douglas, and John L. Brown (Brown), who testified to having been present during the shooting. The evidence established as follows. About 3 p.m. on November 16, 1990, Sanders, Richardson, Douglas and others were in front of a restaurant near the Lawrence Avenue "el" stop when the decedent approached with bruises on his face. Shortly thereafter, the defendant and Barnes exited the "el" station, and a fistfight ensued between them and Sanders, Richardson, and the decedent. Police arrived shortly thereafter and broke up the fight, but the defendant and Barnes stated that they would be back. Brown testified that, at this point, he noticed that the defendant had been injured above his right eye and that he was bleeding.

Later that day, at approximately 5 p.m., the decedent, Sanders, Richardson, and Douglas were in a parking lot behind the Aragon ballroom when the defendant and Barnes approached. Barnes retrieved a pistol from his pants and said "Surprise, bitches, what's up[?]" Sanders, Richardson, and Douglas testified that they then heard shots and began running. Richardson and Douglas testified to having seen both Barnes and the defendant firing weapons. Douglas testified that there were between 12 and 14 shots and that he recognized the sounds of both a 9 millimeter automatic and a revolver. The men fled until the shooting stopped. They later returned to the scene, where they found the decedent motionless on the ground. Shortly thereafter, the defendant was apprehended by police. Richardson and Douglas subsequently identified the defendant in a lineup.

The defendant asserted an alibi defense. His mother's landlord, John Katsafaros, testified to observing the defendant helping another tenant move items out of the building during the afternoon of the shooting. Defense witness Jeanne Powell testified that she witnessed the shooting and that the offenders were two boys, neither of whom was the defendant. Finally, Lucinda Burroughs and her mother, Josephine Burroughs, testified that they met the defendant near the Bryn Mawr "el" stop about 5:15 that afternoon. They had begun walking toward the lake with him, when police arrived and took the defendant away with them.

In rebuttal, Pradeep Roy-Singh, an assistant State's Attorney, testified regarding a statement given by the defendant after his arrest, which was later reduced to writing. In the statement, the defendant admitting being a gang member and participating in the fistfight as described by State witnesses. The defendant also admitted being present during the shooting, but denied having a gun, and stated that Barnes alone fired the shots.

In surrebuttal, the defendant testified that he was 16 years old on the day of the shooting and that he spent the afternoon of November 16 assisting a woman named Darnice in her move to Humbolt Park. The defendant described two separate bus trips he made that afternoon moving belongings from Darnice's home to Humbolt Park. The move was completed about 4:15 p.m., at which time the defendant returned home on the "el" train. Exiting the station, the defendant encountered Lucinda Burroughs and was apprehended by police while he conversed with her. The defendant further testified that he was coerced into signing his statement at the police station.

Following arguments, the jury convicted the defendant of first-degree murder. He then moved for a new trial based upon, *inter alia*, newly discovered evidence of his past mental illness. The trial court denied the motion and, after a hearing, sentenced the defendant to 39 years' imprisonment. The instant appeal followed.

The defendant first contends that his statement to police was not given knowingly and voluntarily, because the officers failed to contact his family or to afford him an opportunity to confer with a youth officer prior to giving the statement, in violation of section 3—8(2) of the Juvenile Court Act of 1987. 705 ILCS 405/3—8(2) (West 1992).

The defendant and Barnes were arrested about 5:45 p.m. on November 16, 1990. Officer Harlan Rothgeb testified that about 7:15 p.m., he informed the defendant that he had been identified as a perpetrator in the shooting and that he would be placed in a lineup. The lineup commenced at approximately 9:45 p.m. and concluded by 10:30 p.m. Rothgeb testified that at that time, he obtained telephone

numbers from the defendant and Barnes and attempted unsuccessfully to contact their relatives. Between 10:30 and 11 p.m., Rothgeb contacted the State's Attorney's office and the youth division, notifying them that a youth officer was needed.

About midnight, youth officer Harry Drochner and Assistant State's Attorney Roy-Singh arrived at the station. Drochner testified that when he first saw the defendant, he noticed a cut above his eye and inquired how it came about. The defendant replied that it had occurred during a gang fight earlier that day and declined Drochner's offer of medical attention. Drochner also asked whether the defendant wanted something to eat, but he declined. Then, from about 12:30 until 1 a.m., Rothgeb interviewed the defendant in the presence of Drochner. Prior to the interview, Rothgeb advised the defendant of his rights under *Miranda*, which the defendant indicated he understood. Additionally, both Rothgeb and Drochner apprised the defendant that he could be tried as an adult due to the nature of his charge. Finally, Drochner obtained parental information and telephone numbers from the defendant. Drochner testified that between 1:30 and 2:15 a.m., he attempted to contact both the defendant's and Barnes' parents and spoke to an aunt and a grandmother, but could not recall which defendant's relative it was.

About 2:30 a.m., Rothgeb interviewed the defendant again in the presence of Drochner and Roy-Singh. Prior to the interview, Roy-Singh informed the defendant of his office and that he was not the defendant's attorney, but was working with police. Roy-Singh also apprised the defendant of his *Miranda* rights, which he again indicated he understood, and then admonished him he could be tried as an adult. Rothgeb testified that he gave the defendant sandwiches about 3 a.m. and that the defendant also ate cookies and drank water.

About 7:30 or 8 a.m., the defendant received *Miranda* rights and gave a written confession in the presence of Roy-Singh, Drochner, and Rothgeb. The defendant reviewed the statement, made corrections and signed it. Drochner testified that the defendant never exercised his right to remain silent and never complained about being hit, coerced, or threatened.

The defendant's mother, Brenda Anderson, testified that at 8:45 on the night of November 16, 1990, she called several police stations, including the one at which the defendant was being held, but was told there was no one there by the name of Farnardo Anderson. Anderson testified that she did not leave her home for the rest of the night and received no calls concerning her son until 9:05 the following morning. The defendant then contacted his mother at 9:25.

Following arguments, the court determined that based upon the totality of the circumstances, the defendant's confession was given knowingly and voluntarily and, further, that authorities had made a substantial effort to contact his parents.

Juvenile defendants are protected by the privilege against self-incrimination, and the burden rests with the State to show by a preponderance of the evidence that a confession was voluntary and was knowingly and intelligently given. (*In re Application of Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428; *People v. Lash* (1993), 252 Ill. App. 3d 239, 242, 624 N.E.2d 1129.) The test is whether, under the totality of the circumstances, the statement was made without compulsion or inducement of any sort, with consideration given to the age, intelligence, experience and other characteristics of the accused as well as the details of the interrogation. (*People v. Melock* (1992), 149 Ill. 2d 423, 447, 599 N.E.2d 941; *People v. King* (1993), 248 Ill. App. 3d 253, 265, 618 N.E.2d 709.) The trial court's determination on a motion to suppress will not be reversed unless it was contrary to the manifest weight of the evidence. *People v. Holloway* (1981), 86 Ill. 2d 78, 426 N.E.2d 871.

Section 3—8(2) provides:

"A law enforcement officer who takes a minor into custody without a warrant *** shall *** immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care *** that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." 705 ILCS 405/3—8(2) (West 1992).

It is well settled that section 3—8 imposes no sanctions for noncompliance, and the failure to adhere to that section does not render a statement *per se* inadmissible. (*Lash*, 252 Ill. App. 3d at 246; *King*, 248 Ill. App. 3d at 266, 267; *People v. Knox* (1989), 186 Ill. App. 3d 808, 815, 542 N.E.2d 910.) Rather, the voluntariness of a juvenile's confession must be evaluated based upon the totality of the circumstances, with noncompliance a factor militating towards inadmissibility. (*People v. Travis* (1984), 122 Ill. App. 3d 671, 677, 462 N.E.2d 654.) This court has deemed suppression warranted where the State failed to take appropriate steps to ensure that a juvenile defendant had an opportunity to confer with either a parent or a youth officer prior to his statement. See *People v. R.B.* (1992), 232 Ill. App. 3d 583, 593, 597 N.E.2d 879, citing *Knox*, 186 Ill. App. 3d 808, 542 N.E.2d 910 (confes-

sion suppressed where no youth officer present until after statements, and mother who went to station was precluded from seeing her son).

 ■ In this case, the defendant was at the station an entire night before police were able to reach his parents, and he had been there nearly six hours before a youth officer arrived. However, the determinative factor in this case was that the defendant was not interviewed until after Drochner arrived and was never questioned outside his presence. (See *Knox*, 186 Ill. App. 3d at 814-15 (opportunity to confer with youth officer "crucial" in determining voluntariness); see also *King*, 248 Ill. App. 3d 253, 618 N.E.2d 709.) Immediately upon his arrival, Drochner inquired about the injury above the defendant's eye and whether he wanted something to eat. The defendant replied that he received the injury in a gang fight and declined medical attention. Prior to each questioning session, the defendant was apprised of his *Miranda* rights and acknowledged that he understood them. He was given food and soft drinks and never reported having been beaten or coerced in any manner, or having been given any promises in exchange for his statement. Although the defendant argues that he was not afforded a chance to confer with Drochner prior to giving his statement, there is no evidence that he ever sought or was denied such an opportunity. Thus, his claim is without merit.

The defendant's next two issues involve his history of mental illness, which was not revealed until after trial. In order to facilitate discussion of these issues, a summary of the evidence of this illness is set forth below.

Prior to the sentencing hearing in this case, the defendant's mother gave defense counsel two documents compiled by the Department of Corrections (DOC) during the defendant's incarceration for a previous offense. One document indicated that on July 7, 1988, the DOC's consulting psychiatrist had placed the defendant on daily doses of Navane for four weeks. The second document, dated September 7, 1989, was a psychological evaluation and treatment report for the defendant, prepared by an unidentified DOC employee. This report noted that the defendant had been in therapy since April 27, 1989, because of a rather extensive psychiatric history involving aggressive actions, impulsivity, and psychotic symptoms. In particular, the report noted that the defendant occasionally spoke about an imaginary friend named "Tommy," whom he sometimes perceived as real and who apparently emerged during stressful periods in his life. The report also urged that efforts be made to rectify the defendant's problem-solving skills, noting that he was "adept at thinking of ways to 'beat the system' " and often disregarded social rules and regulations when formulating solutions to problems.

Upon receiving these documents, defense counsel obtained leave of court for the defendant to undergo further psychiatric testing. On March 19, 1993, the defendant was examined by Dr. Roni Seltzberg, a staff psychiatrist with the Psychiatric Institute of the circuit court, regarding his fitness for sentencing. In his report, Seltzberg stated that he believed the defendant was fit for sentencing because he was able to understand that what he had done was wrong. Seltzberg also noted that the defendant had made "what appears to be a grand effort to appear unfit and has shown evidence of malingering with the production of psychiatric symptomatology that is completely inconsistent with any known psychotic or psychiatric disorder."

On April 28, 1993, Seltzberg again evaluated the defendant, this time to determine his mental condition at the time of his statements to police the night of the shooting. Seltzberg was unable to render an opinion on this issue, however, noting that the defendant was evasive and uncooperative throughout the examination and that he maintained he could not recall making the statement or having received *Miranda* warnings. Seltzberg indicated that further tests were needed to rule out the defendant's claim of memory loss.

On April 29, 1993, the defendant was examined by his private psychiatrist, Patricia Jones. Jones stated that at the time of her evaluation, the defendant was psychotic with visual and auditory hallucinations and auditory delusions. She noted that the defendant apparently had four prior psychiatric hospitalizations, but remarked that his records were unavailable to her. Three hospitalizations were between the ages of 8 and 13, and the fourth was the previous year. Jones also noted the existence of "Tommy" and stated that the defendant could see Tommy in the room during the examination. In Jones' opinion, these symptoms were consistent with multiple personality disorder.

Jones stated that at the time of the murder at issue, the defendant was taking Navane and Cogentin and was, "according to his history," hearing voices and feeling paranoid that people wanted to hurt him. The defendant denied being at the murder scene or seeing the decedent or Barnes at all that night. Jones stated that according to the defendant, police pressured and beat him to obtain his statement, but "Tommy" would not let him sign the document, and he refused to do so. Jones indicated that based upon the defendant's statements, it was possible he was present at the shooting but was in a "blackout," or dissociative state, and did not remember it. It was also possible that the defendant "was in another personality" at the time he signed his statement.

Based upon Jones' findings, the defendant moved for a new trial, but his motion was denied.

The defendant now argues that his trial counsel was ineffective for failing to discover or investigate his history of mental illness prior to trial. In order to prevail on a claim for ineffective assistance of counsel, the defendant must prove both that (1) his counsel's performance fell below that reasonably demanded of attorneys in criminal cases; and (2) there was a reasonable probability that but for counsel's errors, the outcome of the trial might have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Griffin* (1992), 148 Ill. 2d 45, 57, 592 N.E.2d 930.) There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (*Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Edwards* (1991), 218 Ill. App. 3d 184, 198, 577 N.E.2d 1250.) Counsel's performance must be evaluated in light of prevailing professional norms (*People v. Collins* (1992), 153 Ill. 2d 130, 137, 606 N.E.2d 1137), and based upon the facts of the particular case, viewed as of the time of counsel's conduct rather than in hindsight. (*People v. Emerson* (1992), 153 Ill. 2d 100, 108, 606 N.E.2d 1123.) In order to prove ineffective assistance based upon a failure to investigate, the defendant must show a reasonable probability that had counsel undertaken the investigation, the result of the proceedings would have been different. *People v. Kluppelberg* (1993), 257 Ill. App. 3d 516, 628 N.E.2d 908.

The defendant admits that his counsel had no documented evidence of his psychiatric history prior to receiving the DOC records. He maintains, however, that counsel should have obtained DOC records on his own prior to trial and learned that the defendant had been placed on the drug Navane and that he previously exhibited symptoms of psychotic behavior.

■ We are unable to conclude that counsel's failure to review the defendant's prior DOC records amounts to incompetent representation. Importantly, counsel had no basis to have suspected the alleged illness until he was told about it: there is no evidence the defendant exhibited any unusual behavior to anyone involved with this case either during the pretrial phase, his own testimony, or any other portion of the trial. Moreover, prior to speaking with Jones, he never reported being on medication, hearing voices or "blacking out" at any point during the occurrence or while giving his statement. Instead, he claimed to clearly recall being busy at the time of the shooting, helping a friend move belongings across town. He recounted his whereabouts in detail and called several witnesses to substantiate his story. In light of this account and the lack of apparent mental illness, there was no reason for defense counsel to review records from prior incarcerations.

■ Further, it does not appear the defendant was prejudiced by the absence of these records, either during the suppression hearing or at trial. Initially, apart from the DOC documents, the author of which was unidentified, there are apparently no available medical records to substantiate the defendant's reported history or, critically, to show that he was suffering from any illness at the time of the shooting. See *People v. Thompson* (1988), 166 Ill. App. 3d 909, 520 N.E.2d 1146 (failure to further investigate defendant's psychosis not ineffective assistance of counsel where no evidence illness was present during crime at issue).

Jones' evaluation, conducted well over two years after the offense, suggests only the "possibility" that the defendant was in a dissociative state during the shooting and during his statement, but calls for further testing. For purposes of the suppression motion, this would have to be balanced against the unwavering testimony of youth officer Drochner and several police officers that the defendant was cooperative during his custody, that he knowingly and voluntarily gave his statement, and that he never complained of being pressured, coerced or beaten.

Similarly, at trial, Jones' findings would have to be weighed against the DOC's opinion that the defendant was adept at devising ways to "beat the system" and Seltzberg's opinion that he was malingering and concocting symptoms entirely inconsistent with any known mental disorder. The new evidence does not raise a reasonable probability that, had it been discovered earlier, the outcome of the trial would have been different.

There is no basis to conclude that defense counsel was ineffective. Once he became aware of the evidence, he promptly ordered further evaluation and moved for a new trial. Further, the record indicates that he diligently represented the defendant's interests at trial, cogently and thoroughly presenting his alibi defense. Thus, the defendant's contention is without merit.

The defendant also argues that he should have been granted a new trial in light of the new evidence of multiple personality disorder.

Motions for a new trial based on newly discovered evidence are disfavored by the courts and must be scrutinized carefully. (*People v. Holtzman* (1953), 1 Ill. 2d 562, 569, 116 N.E.2d 338; *People v. McCartney* (1990), 206 Ill. App. 3d 50, 60, 563 N.E.2d 1061.) The new evidence must be of such a conclusive nature that it will probably change the result on retrial, must be material to the issue and not merely cumulative, and must have been discovered since the trial and be of such character that it could not have been found prior to

trial in the exercise of due diligence. (*People v. Silagy* (1987), 116 Ill. 2d 357, 368, 507 N.E.2d 830; *McCartney*, 206 Ill. App. 3d at 60.) The decision to deny such a motion rests in the discretion of the trial court, whose determination will not be reversed absent clear abuse of discretion. *Holtzman*, 1 Ill. 2d at 569; *McCartney*, 206 Ill. App. 3d at 60.

■ In this case, the new evidence is not so conclusive that it would change the result on retrial. As stated above, there was no proof that the defendant was undergoing psychotic symptoms or any other mental defect at the time period of the offense. Jones' examination indicated the "possibility" of mental illness at the relevant time periods, but called for further testing. Further, we are skeptical of Jones' opinion, which purports to diagnose the defendant's mental condition on a day some two years before her examination, largely without the benefit of medical records. Finally, her opinion must be balanced against the evidence of malingering contained in Seltzberg's report.

■ The defendant argues that this evidence may warrant an insanity defense, but we disagree. To prevail on this defense, he would have to show by a preponderance of the evidence that he was insane at the time of the offense. (See 720 ILCS 5/3—2(b) (West 1992).) In the case at bar, the evidence relating to the defendant's sanity at the time of the offense is largely inconclusive. It is not of the character that warrants a new trial, and there was no abuse of discretion by the trial court.

The defendant next argues that the State intentionally elicited testimony in his cross-examination that he had been released from prison only a week prior to his arrest for the offense at bar.

During the defendant's cross-examination, the assistant State's Attorney inquired how long he had resided at his address at the time of the shooting. The defendant replied "I had just got [*sic*] out of Saint Charles November 9th." When the assistant State's Attorney then inquired "St. Charles where," the defendant responded "Saint Charles, Illinois. It is a juvenile detention center."

■ We are not persuaded that the above testimony was elicited intentionally or that it constituted misconduct; rather, it was volunteered by the defendant, who cannot now complain of error. (See *People v. Jones* (1987), 161 Ill. App. 3d 688, 698, 515 N.E.2d 166; *People v. Petty* (1972), 3 Ill. App. 3d 951, 954, 279 N.E.2d 509.) In any event, once the above colloquy was completed, the prosecutor made no further reference to the defendant's prior incarceration. (See *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59; *People v. Sullivan* (1978), 72 Ill. 2d 36, 377 N.E.2d 17.) The passing reference to the

defendant's prior incarceration did not prejudice him so as to warrant a new trial.

Last, the defendant argues that the court erred in sentencing him to 39 years' imprisonment in light of his lifetime history of mental illness. We disagree.

Trial courts have broad discretion in sentencing, and the imposition of sentence is a matter of judicial discretion that, absent abuse, may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153-54, 368 N.E.2d 882.) In determining a reasonable sentence, the court may consider a wide range of factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. *Perruquet*, 68 Ill. 2d at 154.

Defendant was convicted of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1), which carries a sentence range of between 20 and 60 years' imprisonment (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)). It is true that at the time of the crime, the defendant was only 16 years old and had some history of mental illness and had spent a large part of his life in foster homes. However, the evidence proved that he and Barnes were gang members who intentionally stalked rival gang members. When they encountered their intended victims, they indiscriminately sprayed gunfire into a large group of individuals, killing a 14-year-old boy. Further, although the defendant argues that the court failed to consider his rehabilitative potential, he committed this crime only one week after being paroled for a prior sexual assault adjudication. The record indicates that in sentencing the defendant, the court took note of his mental health. In sentencing the defendant in the middle of the sentence range, there is no indication the court considered improper factors and no basis for reversal.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

THEIS and S. O'BRIEN, JJ., concur.