**STATE of Missouri, Respondent,**

v.

**Michael FLOYD, Appellant.**

**No. ED 95249.**

Missouri Court of Appeals,
Eastern District,
Division One.

Aug. 16, 2011.

Gwenda Renee' Robinson, St. Louis, MO, for appellant.

Chris Koster, Atty. Gen., Jamie P. Rasmussen, Jefferson City, MO, for respondent.

GARY M. GAERTNER, Jr., Judge.

### Introduction

The defendant, Michael R. Floyd (Floyd), appeals his convictions after trial for murder in the first degree and armed criminal action. Floyd raises two points on appeal: 1) the trial court erred and abused its discretion in admitting Floyd's statement in rebuttal; and 2) the trial court erred in admitting evidence regarding the identification of Floyd in a photo lineup and physical lineup. We affirm.

### Background

Floyd was charged with murder in the first degree and armed criminal action for the shooting of Virgil Robinson (Robinson) on March 11, 2008. The following pertinent witnesses testified in the State of Missouri's (State) case-in-chief.

### April Abram

On March 11, 2008 at approximately 3:00 p.m., April Abram (Abram), who had just moved to the area of Atkinson and Pope, was exploring the neighborhood trying to orient herself. When Abram was walking down Holly, she observed two young men, Robinson and Jodeci Brown (Brown), come out of a street gangway. Brown was wearing a black jogging suit and backpack, and Robinson was wearing a red bandana on his head. Brown was talking to Robinson who appeared worried and walked with his head down, as Brown told him it was going to be okay. The young men spoke to Abram who responded back. The young men crossed the street and Abram also crossed the street to avoid a pit bull dog.

As Abram approached the corner of Holly and Carter, she was only a few feet behind Robinson and Brown as they turned the corner towards a store on Athlone. She noticed another young man, Floyd, who was wearing a white jacket, white pants with red stripes, and a red and white cap on his head and was kneeling down in the alley by a trashcan. She saw Floyd get up and start walking down Carter. As she was crossing the street, a white car sped off which forced her to turn around and look. She observed Floyd put his hoodie on as he walked up to Robinson and shot him three times.

Abram fell to the ground and covered her head, but she could still see. Abram was as close to the shooting as she was to the jury in the courtroom. Brown hopped a fence as Floyd shot at him three or four times. Floyd smiled at Robinson's little brother who had run from Yeatman Market crying and hollering. Floyd then walked across the schoolyard, before jogging and disappearing. Abram did not see Brown shoot at Floyd.

Abram talked to the police about what she had seen. When asked if she could identify Floyd, Abram stated, "I didn't have no other choice. I'm lookin' him dead in his face, I'm right there on the streets. I'm right there." Abram described Floyd as her same height and build, six foot and skinny, but with lighter complexion. On March 15, 2008, homicide Detective Matthias Hanewinkel (Detective Hanewinkel) showed Abram a photo lineup. Abram circled and initialed the photograph of Floyd, "[b]ecause I thought about his mother. I thought about my only son and if it happened to my son and someone saw it, I would want them to tell—I would want them to do the same thing that I was doin[g]."

Abram picked Floyd out of the photo lineup based upon his face. Abram was 100% sure that she identified him because she could never forget that face. On April 13, 2008, Abram picked Floyd out of a physical lineup and also identified Floyd in the courtroom at trial. Abram had never

seen Robinson, Brown or Floyd prior to the day of the shooting. Abram did not see Floyd again until after his arrest.

### Brandon Bolhous

Brandon Bolhous (Bolhous) is a special education teacher at Yeatman Junior Preparatory School located at 6321 Athlone. On March 11, 2008 following the end of school at 2:50 p.m., Bolhous looked out a window and saw an individual, wearing a white hoodie, shoot Brown and Robinson, and Brown return fire as he ran down Clarence. He could not identify Floyd as he could not see his face from where he was looking.

### Johnny Smith

Johnny Smith (Smith) is Robinson's younger brother. Robinson went by the nickname of V–Red and often wore a red bandana. Smith ran down the street from Yeatman Market after he heard the gunshots and saw his brother lying on the street. Smith did not see the shooter's face as he ran on Holly.

### Brown

Brown was fifteen on March 11, 2008, and was Robinson's "Homey." When Brown and Robinson reached the intersection of Holly and Carter, he heard a shot, turned around, and saw an individual with a blue hoodie standing over Robinson and a white Pontiac Z34 with black tinted windows. Brown asserted that he did not see the shooter's face or shoot back at the shooter himself. Brown did not want to get involved and did not talk to the police. He maintained that he could not remember anything after the shooting happened. Brown and Robinson knew Floyd from the neighborhood.

Brown stayed in the hospital for three weeks and had a bullet removed from his back. Detective Hanewinkel showed Brown a photo lineup at the hospital, but Brown did not look at it.

### Detective James Stagge

Detective James Stagge (Detective Stagge) is a St. Louis Metropolitan Police Detective assigned to the Gang Unit. On March 11, 2008, Detective Stagge was at Yeatman Middle School watching Lieutenant Ronnie Robinson (Lieutenant Robinson) give a talk to the student body about gang activity. Detective Stagge saw Robinson outside the school hanging out around 2:50 p.m. Detective Stagge also knew Floyd prior to March 11, 2008.

Detective Stagge received a call for a homicide and a request for a gang unit detective. Detective Stagge was dressed in plain clothes and stood in the back of the crowd that had gathered at Robinson's murder scene. He recognized several people from the neighborhood and was told that Fat Loc had committed the murder. Detective Stagge had heard the name Fat Loc before and he eventually associated it with Floyd. Detective Stagge gave this information to the homicide detectives.

### Detective Hanewinkel

On March 11, 2008, Detective Hanewinkel responded to the murder scene at approximately 3:58 p.m. No witnesses stepped forward at the scene, but Detective Hanewinkel interviewed Abram at police headquarters later that night. After receiving information about Fat Loc from Detective Stagge, Detective Hanewinkel, on March 15, 2008, compiled one six-person photo lineup with photographs generated by a computer based upon race and build, with the hairstyles chosen by Detective Hanewinkel. Abram instantly picked out Floyd.

Previously on March 12, 2008 at the hospital, Detective Hanewinkel had shown

Brown a photo lineup with Floyd in it. Brown was hesitant to talk and would not look at the photo lineup and eventually did not pick out anyone.

Detective Hanewinkel went to Floyd's residence at 4229 Holly on March 18, 2008. Detective Hanewinkel talked to Floyd's mother who said she saw part of the shooting as she was driving down the alley and the shooter was not her son.

Floyd was arrested on April 12, 2008, driving a white Pontiac G6. Abram identified Floyd on April 13, 2008 from a four-person physical lineup. Prior to identifying Floyd, Abram asked if the individuals in the physical lineup would put their hoods up, because this is the way she saw the shooter. After two pulled up their hoods and two pulled up their collars, Abram was positive that Floyd was the shooter.

Police found .40 and .380 caliber shell casings at the murder scene, but did not discover any firearms. Brown admitted to Detective Hanewinkel that he did have a gun.

Detective Hanewinkel was contacted by Lieutenant Robinson who wanted to know the status of the case as his nephew was the deceased. Detective Hanewinkel showed Lieutenant Robinson a photo of Floyd. Lieutenant Robinson identified Floyd as being at Yeatman School the day of the shooting.

### Lieutenant Robinson

Lieutenant Robinson, now a captain with the St. Louis Metropolitan Police Department, was acquainted with Robinson, knew Robinson's dad very well and was a long-time friend of Robinson's uncle. There was no blood relation, but Lieutenant Robinson was "kind of adopted into the family" by Robinson's grandparents.

On March 11, 2008, Lieutenant Robinson, assigned to the Crime Suppression Unit and the coordinator for the Great Program, was at Yeatman School attending a graduation from a gang deterrent program. Lieutenant Robinson saw Floyd on the street adjacent to the school on Athlone, just before dismissal of school. Lieutenant Robinson knew Floyd from his work in the neighborhood during the time he worked in the Intelligence Unit.

Robinson's dad called Lieutenant Robinson after the homicide, which prompted Lieutenant Robinson to go to the homicide office where he saw a picture of Floyd on the wall. Lieutenant Robinson told the homicide detectives that he had seen Floyd in the neighborhood after Detective Hanewinkel had informed him that Floyd was a person of interest in Robinson's murder.

### Detective Michael Minor

Detective Michael Minor (Detective Minor) was a member of the Violent Offender Unit for the St. Louis Metropolitan Police Department. On April 12, 2008, after receiving information concerning Floyd, Detective Minor arrested Floyd in the 4500 block of Red Bud driving a white Pontiac G6. The 4500 block of Red Bud is approximately two to three blocks from the intersection of Holly and Carter.

Floyd presented the following evidence in his case-in-chief.

### Essie Floyd

Essie Floyd (Ms. Floyd) is Floyd's mother and lives at 4229 Holly Avenue near Yeatman School. Ms. Floyd testified that her son had lived at 4229 Holly for seventeen years, but had recently moved out two to three weeks prior to the shooting with his girlfriend Tonya Washington to St. Charles. On March 11, 2008, Ms. Floyd was on her front porch waiting for her daughter to get off the bus. Her front

porch is located about ten houses from the intersection of Holly and Carter. When she and her daughter were walking up the steps, she heard gun shots and saw a young man running towards them with a white hoodie on his head. Ms. Floyd saw the young man cut through a yard before he got to her house. While Ms. Floyd did not get a good look at his face, she said that it was not her son as her son was taller. Ms. Floyd testified that she does not have a driver's license and has never driven. She did not call the police that day to report what she had seen.

### Tonya Washington

Tonya Washington (Washington) has known Floyd for four or five years and is presently his girlfriend. Washington and Floyd had just moved to Gray Court in St. Charles on March 5, 2008. Washington denied telling Detective Hanewinkel that she had moved into the apartment the night before Robinson's homicide.

On March 11, 2008, Washington went to work at Park Place Senior Living in O'Fallon, Missouri in St. Charles County from 8:00 a.m. until 4:00 p.m., and she did not know where Floyd was during that time. Washington dropped her three children off at day care before going to work. Floyd stayed at home in the apartment and did not ride with her to work that day. Washington did not lend her car to anyone that day and when she got off work at 4:00 p.m., her car was still on the lot at work. Washington left work, picked up her children, and went home for ten minutes. She picked up Floyd from the apartment and drove Floyd and her children down to Ms. Floyd's house in the city to get Floyd's clothes. Washington "got some gas" on Athlone when she saw police cars everywhere and was then told that someone had been shot.

Washington was driving a white Pontiac G6 without tinted windows. Floyd also drove that car and was arrested in the car near his mother's house. There were also several other people in the car with Floyd when he was arrested.

The following witness testified in rebuttal for the State.

### Detective Hanewinkel

Detective Hanewinkel talked to Floyd the day he was arrested. Detective Hanewinkel read him his Miranda rights off MPD Warning and Waiver Form 168 which Floyd signed. Floyd told Detective Hanewinkel that he was with his girlfriend, Washington, at her apartment in St. Charles the night of March 10, 2008, and the whole day and night of March 11. Floyd stated he just hung out, watched TV and ate. Floyd never indicated when he left or that Washington went to work at any time.

Detective Hanewinkel asked for Washington's phone number and address, but Floyd was unsure of it as she had just moved. Detective Hanewinkel was never able to reach Washington, until she contacted him on June 11. Washington told Detective Hanewinkel that she was at work from 8:00 a.m. until 4:00 p.m. on March 11.

The jury found Floyd guilty of murder in the first degree and armed criminal action. The trial court sentenced Floyd to life imprisonment without probation or parole for the murder conviction and a concurrent term of thirty years' imprisonment for the armed criminal action conviction. Floyd appeals.

### Discussion

#### Point 1

Floyd argues that the trial court erred in allowing the State to call Detec-

tive Hanewinkel as a rebuttal witness to testify about Floyd's statement that the State used to rebut defendant's alibi witness Washington, in that "his [Detective Hanewinkel] testimony bore upon a collateral issue, went beyond the permissible scope of rebuttal, and was inadmissible." Floyd further argues that the State failed to show that Floyd's statement was voluntary and the State failed to lay a proper foundation for the admission of a non-testifying defendant's prior statement to rebut the testimony of a witness at trial.

"The trial judge determines the scope of rebuttal testimony, subject to review for abuse of discretion." *State v. Gardner*, 8 S.W.3d 66, 72 (Mo. banc 1999) (citing *State v. Leisure*, 749 S.W.2d 366, 380 (Mo. banc 1988)). "A trial court has broad discretion in determining the admissibility and scope of rebuttal evidence." *State v. Smith*, 265 S.W.3d 874, 878 (Mo. App. E.D.2008) (citing *State v. Hurley*, 208 S.W.3d 291, 293 (Mo.App. S.D.2006)). "This Court will not hamper the exercise of that discretion unless it is clear that the trial court's ruling is against the logic of the circumstances and is 'so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Id.* (citation omitted).

"Mere error is insufficient to support a reversal; this court will affirm the trial court's judgment unless the appellant shows that the error was so prejudicial as to deprive him of a fair trial." *State v. Martin*, 211 S.W.3d 648, 653 (Mo.App. W.D.2007)(citing *State v. Hamilton*, 892 S.W.2d 371, 380 (Mo.App. E.D.1995)). "The test for prejudice where a criminal appellant claims improper admission of evidence 'is whether the improper admission was outcome-determinative.'" *Id.* (citing *State v. Black*, 50 S.W.3d 778, 786 (Mo. banc 2001)).

"'Any competent testimony that tends to explain, counteract, repel or disprove evidence offered by defendant may be offered in rebuttal of the defendant's testimony or evidence.'" *Gardner*, 8 S.W.3d at 72 (citing *State v. Peterson*, 518 S.W.2d 1, 3 (Mo. banc 1974)). "[R]ebuttal testimony is not necessarily inadmissible simply because it is cumulative of the state's evidence-in-chief or because it would have been better procedure to offer it as part of the state's evidence-in-chief instead of rebuttal." *State v. Petty*, 967 S.W.2d 127, 141 (Mo.App. E.D.1998) (citing *State v. Arnold*, 859 S.W.2d 280, 282 (Mo. App. E.D.1993)). Further, if the defendant raises an issue directly or by implication, the prosecutor can present otherwise "inadmissible testimony to counteract the negative inference the defense has injected into the case." *Martin*, 211 S.W.3d at 653 (citing *Hamilton*, 892 S.W.2d at 379).

The trial court did not err or abuse its discretion in allowing the rebuttal testimony of Detective Hanewinkel. Floyd filed his pretrial notice of alibi that he was in St. Charles at the time of Robinson's murder, and he listed Ms. Floyd and Washington as alibi witnesses. At trial, Floyd presented Washington's testimony as his alibi that he was in St. Charles County. In particular, Washington testified that she left Floyd at her apartment when she went to work between the hours of 8:00 a.m. and 4:00 p.m. and picked up Floyd at her apartment after she left work. Washington did not know where Floyd was between the hours of 8:00 a.m. and 4:00 p.m. on March 11, 2008.

Floyd's statement to Detective Hanewinkel used in rebuttal by the State impeached and partially contradicted Washington's testimony as Floyd originally alleged upon his arrest that he was with Washington the entire day of

March 11, 2008, and Floyd further failed to mention that Washington was at work. Where Floyd was on March 11, 2008 is neither a collateral issue, nor inadmissible in rebuttal. By calling Washington as a witness, Floyd placed Washington's alibi testimony directly at issue. While Floyd's statement to Detective Hanewinkel did not directly refute Floyd's alibi, it indirectly rebutted the testimony of the alibi witness, Washington, by undercutting her credibility. *State v. Roberts*, 622 S.W.2d 226, 226–227 (Mo.App. E.D.1981).

By placing Washington on the stand, Floyd opened himself up to the State's rebuttal. It was no small detail left out of Floyd's statement that Washington left Floyd at the apartment while she went to work on March 11, 2008; those inconsistencies were extremely probative for the State. Further, when you contrast the State's timeline that Lieutenant Robinson saw Floyd outside Yeatman School before 2:50 p.m., witness Bolhous saw the shooting immediately after dismissal of school at 2:50 p.m., and witness Abram actually saw Floyd shoot Robinson, with Floyd's timeline from Washington's alibi testimony and Floyd's statement, Floyd's complaint has no merit as these timelines demonstrate the propriety of the State's rebuttal evidence.

■ Floyd also asserts that the trial court failed to determine the voluntariness of Floyd's rebuttal statement to Detective Hanewinkel, known as a "Denno voluntariness hearing" after the United States Supreme Court case of *Jackson v. Denno*, 378 U.S. 368, 395, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). While Floyd filed a pretrial motion to suppress identification, Floyd did not file a pretrial motion to suppress statements, nor did he orally request suppression of his statement or a "Denno voluntariness hearing" during trial when the State presented Floyd's statement through Detective Hanewinkel. Floyd's motion for new trial also does not mention the voluntariness of his statement. A trial court is not required to hold a "Denno voluntariness hearing" on its own motion; therefore Floyd waived this hearing and issue.[1] *State v. Harper*, 465 S.W.2d 547, 548 (Mo.1971); *State v. Jackson*, 448 S.W.2d 895, 896 (Mo.1970); *State v. Sager*, 600 S.W.2d 541, 557 (Mo.App. W.D.1980).

■ Floyd also argues that the State failed to lay a proper foundation for the admission of a non-testifying defendant's prior statement to rebut the testimony of a witness at trial. Floyd neither raised this argument at trial nor in his motion for a new trial. Accordingly, the argument is not preserved and review is for plain error. Rule 29.11(d); *State v. Moore*, 303 S.W.3d 515, 522–23 (Mo. banc 2010).

Rule 30.20 authorizes this Court to consider unpreserved claims for plain error at our discretion. *State v. Muhammad*, 334 S.W.3d 164, 166 (Mo.App. E.D.2011). Under plain-error review, we only reverse if a plain error affecting a substantial right results in manifest injustice or miscarriage of justice. *Id.* "Plain-error review involves a two-step analysis." *Id.* "First, we determine whether the trial court committed plain error, which is error that is evident,

---

1. In light of Detective Hanewinkel's testimony that he Mirandized Floyd and had him sign a waiver and warning form before making any statement and the fact that there was no evidence presented pretrial or at trial which indicated that Floyd's statement was involuntary, it is highly unlikely that the trial court would have found his statement involuntary. Regardless, a formal "Denno voluntariness hearing" outside the jury's presence is still mandated if requested and not waived. Better trial practice though would be to hold a "Denno voluntariness hearing" even if one is not requested by the defendant.

obvious, and clear." *Id.* "If we so conclude, we may then proceed to the second step of the analysis to consider whether manifest injustice or a miscarriage of justice actually resulted from the error." *Id.*

 Floyd's argument does not show evident, obvious, and clear error. An admission is a statement of a party that tends to incriminate or connect one with the charged crime, "or which manifests a consciousness of guilt. In determining whether a defendant's statement constitutes an admission, the court must consider the defendant's statement in light of the surrounding circumstances." *State v. Isa,* 850 S.W.2d 876, 894 (Mo. banc 1993)(citing *State v. Spica,* 389 S.W.2d 35, 53 (Mo. 1965), *cert. denied,* 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966)). While a statement does not need to be an express acknowledgement of guilt to qualify as an admission, "[a] false denial can constitute an admission as well as manifest a consciousness of guilt." *Isa,* 850 S.W.2d at 894.

 "[T]he admission of a party opponent is not hearsay." *State v. Simmons,* 233 S.W.3d 235, 237 (Mo.App. E.D.2007)(citing *State v. Brown,* 833 S.W.2d 436, 438 (Mo.App. W.D.1992)). "A statement may be admitted as an admission of a party opponent if the statement is material to the issues of the case, the statement is relevant to the case, and the statement is offered by the opposing party." *Id.*

Floyd's statement, offered by the State as the party opponent, cannot be viewed sitting alone. Floyd's statement must be viewed in light of the totality of the surrounding circumstances of Washington, Lieutenant Robinson, and Abram's testimony. When viewed in this light, Floyd's statement manifests a consciousness of guilt, and is both material and relevant. Therefore, Floyd's rebuttal admission was not hearsay and was properly admitted.

Floyd further complains that because he did not testify, his statement cannot be used against him. There is no practical difference between the State using an admission against interest by a defendant in its case-in-chief before a defendant has even had the option to testify and using the same admission in rebuttal when a defendant has chosen not to testify. The evidence Floyd presented in his case-in-chief transformed his statement to Detective Hanewinkel from an exculpatory statement to an inculpatory admission against interest, which the State properly used against him.

While much dust may have accumulated on the case of *State v. Miller,* 29 S.W.2d 54 (Mo.1930), and a defendant's Constitutional protections have greatly expanded, prosecution and trial practice has not significantly evolved. In *Miller,* the defendant did not testify but presented alibi witnesses to his whereabouts during an armed robbery. *Id.* at 55. The State presented two witnesses in rebuttal who testified that the defendant told them that he was at some other place than where his alibi witnesses had testified. *Id.* The defendant complained on appeal that the rebuttal was improper as he did not take the stand, but the Missouri Supreme Court found that the evidence was a direct admission of the defendant as to his whereabouts, which contradicted his alibi and was therefore proper rebuttal. *Id.*; *see also McGee v. State,* 280 Ark. 347, 658 S.W.2d 376, 378–79 (1983); *Music v. State,* 448 N.E.2d 1082, 1086 (Ind.1983); *People v. McCartney,* 206 Ill.App.3d 50, 150 Ill. Dec. 934, 563 N.E.2d 1061, 1066–67 (1990).

As this Court finds no error in the admission of Floyd's statement in rebuttal, Floyd's first point is denied.

### Point 2

Floyd complains that the trial court erred in overruling his motion to sup-

press identification and in admitting State's exhibit 70, the photo lineup, and State's exhibit 72 and 73, photographs of the physical lineup. Floyd asserts that the identification procedures were unduly suggestive and the identification unreliable because "[p]olice used a photo lineup in which Mr. Floyd was the most light-complected person depicted, and later conducted a physical lineup in which Mr. Floyd was the only repeat player, and one of only two men whose skin complexion and dress resembled that of the shooter."

Floyd filed a pretrial motion to suppress identification, which the court took with the case. At trial, Floyd objected "subject to his pretrial motion" to exhibits 70, 72, and 73, which the court overruled. Neither Floyd's pretrial motion nor new trial motion indicated why the identifications were impermissibly suggestive or unreliable. Accordingly, the argument is not preserved and review is for plain error. *Moore*, 303 S.W.3d at 522–23; *State v. Rasheed*, 340 S.W.3d 280, 287 (Mo.App. E.D.2011). Floyd's argument does not show evident, obvious, and clear error.

 Identification testimony is admissible unless the pretrial identification procedure is impermissibly suggestive, and this suggestive procedure made the identification unreliable. *State v. Middleton*, 995 S.W.2d 443, 453 (Mo. banc 1999). "A pre-trial identification procedure is unduly suggestive if the identification results not from the witness's recollection of first-hand observations, but rather from the procedures or actions employed by the police." *State v. Chambers*, 234 S.W.3d 501, 513 (Mo.App. E.D.2007). "The key issue in determining whether unduly suggestive pre-trial procedures tainted the identification is whether the witness has an adequate basis for the identification independent of the suggestive procedure." *Id.* "Identification evidence will be excluded as impermissibly suggestive 'only when the procedure was so suggestive that it gave rise to a very substantial likelihood of irreparable misidentification.'" *State v. Lewis*, 874 S.W.2d 420, 424 (Mo.App. W.D. 1994) (citation omitted).

 In determining the reliability of a witness's identification, we consider: (1) the opportunity of the witness to view the subject; (2) the witness's degree of attention; (3) the accuracy of any prior description given by the witness; (4) the level of certainty demonstrated by the witness in making the identification; and (5) the interval between the event and the identification procedure. *Middleton*, 995 S.W.2d at 453. However, the defendant must establish that the police procedures were impermissibly suggestive before review of the reliability of the identification is necessary or appropriate. *State v. Vinson*, 800 S.W.2d 444, 446 (Mo. banc 1990); *State v. Allen*, 274 S.W.3d 514, 526 (Mo. App. W.D.2008); *Chambers*, 234 S.W.3d at 513.

 "Dissimilarity in physical appearance, alone, is insufficient to establish impermissible suggestion." *Chambers*, 234 S.W.3d at 513. Because courts normally only require the police to use reasonable efforts to find physically similar participants in a photo lineup, "differences in age, weight, height, hairstyle, and other physical characteristics do not compel a finding of impermissible suggestiveness." *Id.* at 514. Since only identical twins can be identical in a lineup and as long as no one individual clearly stands out in the lineup, "[t]he law does not require exact conformity to ensure an untainted identification procedure." *State v. Williams*, 18 S.W.3d 425, 432 (Mo.App. S.D.2000); *State v. Montgomery*, 596 S.W.2d 735, 737 (Mo. App. E.D.1980). Police are only required to find physically similar participants, even

**126**

if a defendant has a physical abnormality or very distinctive appearance, as no lineup in that type of situation can be expected to provide subjects reasonably close in appearance. *State v. Cooks*, 861 S.W.2d 769, 772 (Mo.App. E.D.1993).

■ The record taken in its entirety fails to demonstrate that the police took any action which made either the photo or the physical lineup impermissibly suggestive. Floyd's first complaint that he was the only participant in both the photo and physical lineups did not render either lineup impermissibly suggestive. *State v. Williams*, 277 S.W.3d 848, 851 (Mo.App. E.D.2009).

Detective Hanewinkel prepared the photo lineup of six individuals which included Floyd. He used a computer to help select the other five individuals. After the computer generated several hundred possibilities based upon the race and build of Floyd, Detective Hanewinkel selected the hairstyle. From the computer-generated photos, Detective Hanewinkel selected five fillers for the photo lineup. Given that all six individuals in the photo lineup were of the same race, similar hairstyle, and general age, Floyd's complaint that he was the most light-complected individual in the photo lineup alone did not make the photo lineup impermissibly suggestive.

■ Floyd also asserts that he was the only light-complected individual in the four-person physical lineup, and that Floyd and only one other individual wore a black hoodie. Detective Hanewinkel testified that a detective will take the defendant around the jail and find other inmates that "have similar characteristics as the defendant, height, weight, hairstyle, skin tone, things like that." The physical lineup contained four individuals who were all similar in age and race, three had very similar hairstyles to Floyd, one was the exact height and build as Floyd, while Floyd had the lightest complexion. Again, when these facts are viewed in their totality, the physical lineup was not impermissibly suggestive.

■ Floyd next contends that the police procedures used for the physical lineup were unduly suggestive because Abram asked if each person in the physical lineup would put their hood up, because that is how she saw the suspect. "[A] lineup is made unduly suggestive when the suggestiveness results from police procedures." *State v. Glover*, 951 S.W.2d 359, 363 (Mo.App. W.D.1997). A lineup is not unduly suggestive when the alleged "taint" in the identification procedure originates from a nongovernmental source. *Id.* The alleged "taint" with Abram's identification in having the individuals in the physical lineup put on their hoods or raise their collars originated from a nongovernmental source, the eyewitness, and not from a procedure used by the police. Further, the raising of the hoods or collars enhanced the eyewitness's ability to identify the murderer. *See Lewis*, 874 S.W.2d at 424–25. The method used by Abram when she viewed the physical lineup goes to the reliability of the identification and not the suggestiveness of the lineup. *See id.* In addition, Floyd's assertion that Abram only saw the shooter in a hoodie that covered his head also goes to the reliability of the identification.

The record demonstrates that the photo and physical lineups were not impermissibly suggestive. Floyd's second point is denied.

*Conclusion*

The judgment is affirmed.

CLIFFORD H. AHRENS, P.J., and ROY L. RICHTER, JJ., concur.