STATE of Missouri, Respondent,

v.

Michael Thomas CONRICK, Appellant.

No. WD 74061.

Missouri Court of Appeals,
Western District.

Sept. 4, 2012.

John W. Grantham, Jefferson City, MO, for respondent.

Amy M. Bartholow, Columbia, MO, for appellant.

Before Division Three: VICTOR C. HOWARD, Presiding Judge, KAREN KING MITCHELL, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Michael Conrick ("Conrick") appeals from his conviction following a jury trial [1] of first-degree robbery and armed criminal action. Conrick argues that the trial court erred in overruling a motion to suppress and in overruling objections at trial regarding the admission of out-of-court and in-court identifications of Conrick by the robbery victim and a witness on the grounds that the identifications were the result of unduly suggestive police procedures. We affirm.

### Factual and Procedural Background[2]

On August 4, 2009, LeRoy Gosseen ("Gosseen") lived in a senior housing apartment complex in Holt, Missouri. That morning, Gosseen's housekeeper took him to the bank to cash a disability check. The housekeeper's son, Michael Mitchell ("Mitchell"), was at Gosseen's residence for a few moments before the housekeeper took Gosseen to the bank. The implication

---

1. Although the crime occurred in Clinton County, the case was tried in Daviess County in response to Conrick's application for a change of venue.

2. We view the facts in the light most favorable to the verdict. *State v. Nelson,* 334 S.W.3d 189, 191 n. 1 (Mo.App. W.D.2011).

from Gosseen's testimony is that Mitchell may have known of Gosseen's plan to go to the bank.

At around 9:30 p.m., Gosseen was speaking on his cell phone. As he finished his call, his unlocked front storm door[3] opened, and a man entered Gosseen's residence. Gosseen had never seen the man before. The man approached Gosseen and stood about three feet from him. The man put out his hand and demanded, "Give me your money." Startled, Gosseen said, "What?" The man repeated his demand. Gosseen said, "You—you don't want to do this thing." The man pulled out a pistol and pointed it at Gosseen's head and said, "I don't want to hurt you, give me your money." Gosseen complied, handing over approximately $1,500.00. The man left, taking Gosseen's cell phone with him.

Conrick was later identified by Gosseen in a photo line-up. Conrick was also identified in a photo line-up by a neighbor, Raymond James ("James"). James had confronted two men in the area in the afternoon on the day of the robbery. James also identified Mitchell in the same photo line-up as the second man he confronted.

Prior to trial, Conrick's counsel ("Trial Counsel") filed a motion to suppress all out-of-court and in-court identification testimony ("Motion").[4] Trial Counsel argued that the photo lineup was tainted by unduly suggestive police procedures, and that the photo lineup had irretrievably tainted the anticipated in-court identification testimony from Gosseen and James. The trial court overruled the Motion.

The only evidence at trial implicating Conrick in the robbery was evidence relating to James's and Gosseen's identifications. No other physical or circumstantial evidence connected Conrick to the robbery. Trial Counsel unsuccessfully objected to the photo lineup and to in-court identification testimony throughout trial. Conrick's post trial motion addressing the photo lineup and in-court identification testimony was denied.

The jury convicted Conrick of first-degree robbery and armed criminal action. Conrick was sentenced to ten years imprisonment on the first count, and five years imprisonment on the second count, to be served consecutively.

Conrick filed this timely appeal.

### Standard of Review

"[A]ppellate courts will reverse a ruling on a motion to suppress only if it is clearly erroneous and will reverse admission of testimony only if the trial court abused its discretion." *Foster v. Missouri*, 348 S.W.3d 158, 161 (Mo.App. E.D.2011) (citation omitted).

### Analysis

In Conrick's single point on appeal, Conrick alleges that the trial court erred in overruling his Motion and his trial objections to Gosseen's and James's out-of-court and in-court identifications of Conrick. Conrick claims "that the State's pretrial identification procedures were unduly suggestive and led to a substantial likelihood of irreparable pretrial misidentification, making subsequent identifications unrelia-

---

3. The main door was standing open at the time.

4. Conrick actually filed two Motions to Suppress. One related to the pretrial identification by Gosseen. The second related to the pretrial identification by James. In all other respects, the Motions to Suppress were identical. The trial court considered the Motions to Suppress collectively. Our analysis similarly addresses the Motions to Suppress collectively. We refer to the Motions to Suppress in the singular for ease of reference.

ble as a matter of law." Specifically, Conrick claims that the State used "photos that bore no resemblance to Conrick, pairing him in a lineup with a suspect known to be present at Gosseen's apartment, and suggesting that the suspect was in the lineup," and that as a result, Gosseen and James were led "to identify the only possible suspect that matched their descriptions, and Conrick was prejudiced because the identification testimony was the sole evidence linking him to these crimes."

Conrick has argued no basis to exclude the in-court identification testimony other than that it was irreparably tainted by the unduly suggestive nature of the photo lineup. We focus our analysis, therefore, on whether the photo lineup was unduly suggestive, and on whether the trial court erred in overruling the Motion and the trial objections seeking to exclude the photo lineup.

### Pretrial Identification Procedures

■ In determining whether pretrial identification of a defendant is admissible, a trial court must engage in a two-step analysis. *State v. Hunter,* 43 S.W.3d 336, 340 (Mo.App. W.D.2001) (citing *State v. Hornbuckle,* 769 S.W.2d 89, 93 (Mo. banc 1989) (other citations omitted)). The first step requires the court to determine whether the pretrial identification (here a photo lineup) was unduly suggestive. *Id.* If so, *and only if so,* the second step requires the court to determine the impact of the suggestive procedure on the reliability of the identification. *Hornbuckle,* 769 S.W.2d at 93.

■ With respect to the first step of the analysis, a pretrial identification procedure " 'is unduly suggestive if the identification results not from the witness's recall of first-hand observations, but rather from the procedures or actions employed by the police.' " *Hunter,* 43 S.W.3d at 340 (quoting *State v. Glover,* 951 S.W.2d 359, 362

(Mo.App. W.D.1997)). If the pretrial identification procedure was not unduly suggestive, " 'then the court may admit the pretrial identification and any in-court identification,' " without consideration of the second step. *Id.* (quoting *Glover,* 951 S.W.2d at 362).

■ If the second step of the analysis is required, the court must determine "whether the 'suggestive procedures [as found] have so tainted the identification as to lead to a substantial likelihood that the pretrial identification was not reliable.' " *Id.* (quoting *Glover,* 951 S.W.2d at 362). In assessing reliability, the court is to consider:

1) the opportunity of the witness to view the subject; 2) the witness's degree of attention; 3) the accuracy of any prior description given by the witness; 4) the level of certainty demonstrated by the witness in making the identification; and 5) the interval between the event and the identification procedure.

*Id.* at 341 (citing *State v. Middleton,* 995 S.W.2d 443, 453 (Mo. banc 1999)). If the assessment of these factors leads to the conclusion that the pretrial identification procedure was unreliable, "then the pretrial identification will be excluded." *Id.* at 340 (citing *Glover,* 951 S.W.2d at 362). "Further, 'if the court finds that the suggestive procedures have so affected the witness as to lead to a substantial likelihood that an in-court identification would not be reliable, then no in-court identification will be permitted.' " *Id.* (quoting *Glover,* 951 S.W.2d at 362).

### Motion to Suppress

We first apply this systematic framework for evaluating claims of error in admitting pretrial identification evidence to Conrick's Motion.

In his Motion, Conrick complained that the photo lineup contained photographs that did not resemble Conrick "in any significant way." The Motion alleged that "[a]ll of the men in the photographic lineup were blonde or heavier than the defendant."[5] The Motion then generally alleged that "the inherent suggestiveness of the photographic lineup, and other circumstances were such" that Gosseen and James were given the "distinct impression" that Conrick was the suspect in the robbery, tainting any ability of either witness to independently identify Conrick as the perpetrator via an in-court identification.

The trial court conducted an evidentiary hearing on the Motion on September 27, 2010. The only witness to testify at the hearing was Detective Tracy Strahm ("Strahm"), a detective with the Clinton County Sheriff's Department. On direct examination by the State, Strahm testified that she provided both Gosseen and James with a photo line-up that included Conrick's picture. She testified that both gentlemen had face-to-face contact with Conrick on August 4, 2009.

Strahm reported that on the night of the robbery, Gosseen told her that the man who robbed him stood within two to three feet of him. She reported that Gosseen identified the man as having dark hair with a pencil-like mustache, and wearing blue jeans and a t-shirt. Strahm referred to her report and added that Gosseen told her the man was about five feet six inches tall. Strahm found no reference in her report to the man's weight or build.

Strahm then identified the photo lineup used during her investigation. She reported that Gosseen identified photograph number 4 (Conrick) as the man who robbed him. Strahm said that she presented the photo lineup to Gosseen seven days after the robbery. She testified that she did not point Conrick out to Gosseen, and that she did not give him any hints.

In addressing the six photographs in the lineup, Strahm testified that three of the individuals had dark brown hair, and three of the individuals were blonde. All of the photographs were of men. Strahm testified that none of the individuals were wearing Department of Corrections' jumpsuits, and that all were in every day street clothes.

Strahm testified that sometime after Gosseen's identification of Conrick from the photo lineup, Gosseen asked to see a "more recent picture" of Conrick. She provided Gosseen with such a picture, and he confirmed his identification of Conrick.

Strahm testified that she showed the same photo lineup to James. She testified that she did not in any way direct James to Conrick "or his co-defendant" (Mitchell) whose picture was also in the lineup. Strahm testified that James did not waste any time in selecting Conrick and Mitchell as the two men he had confronted in the area on the day of the robbery. Strahm reported that when James had the face-to-face conversation with the two men, there was nothing hiding their faces.

During cross-examination, Strahm identified photograph number 3 as Mitchell, and photograph number 4 as Conrick. She identified photograph number 6 as Matthew Hopkins ("Hopkins"), a person of

---

**5.** The Motion also alleged that Conrick was the only person in the photo lineup in a jail uniform. Beyond its mention in the Motion, this allegation was not further developed by Conrick, and appears to have been abandoned. We observe for the record that our review of the photo line-up does not reveal or suggest that Conrick, photograph number 4, was in a jail uniform.

interest initially interviewed by the police in connection with the robbery.[6]

Strahm testified on cross-examination that the full extent of Gosseen's initial identification of the robber was that he was "a male subject, white, dark hair, pencil-pen-like mustache." Strahm acknowledged that Gosseen made no mention that the man was missing a tooth. Strahm said that James told her that he knew one of the two men he confronted on August 4, 2009 to be Mitchell. She said that James reported Mitchell to have short hair, and to be wearing a ball cap, blue jeans and a t-shirt at the time he was confronted.

Strahm admitted that three of the six individuals in the photo lineup were blonde, and that one of the other three (photograph number 6—Mathew Hopkins) had light brown hair. She admitted that the lineup was shown first to James, and that the only evidence of his selections of Mitchell and Conrick (photographs number 3 and number 4) was her recollection, and the recollection of her partner, Detective Neill. She admitted that when James looked at the lineup, he easily pointed out Mitchell because he had already told her that he recognized Mitchell at the time he first confronted the men. She said James then identified Conrick.

Strahm testified that she showed Gosseen the lineup after showing it to James, and "asked him to look at the photo lineup and tell me which the person—who the person was that came into his residence." When asked if this was a quote, Strahm said "yes." Strahm testified that Gosseen "look[ed] at the pictures for a few minutes and then he identified No. 4."

On redirect, Strahm testified that the person in photograph number 1 had frosted blonde hair with dark roots. She testified that another one of the blonde suspects, number 3, had brown eyebrows.

No further evidence was presented during the hearing. In arguing the Motion, Trial Counsel emphasized that Gosseen was told when presented with the photo lineup to "pick out the guy who robbed you." Trial Counsel argued that three of the six photographs were of persons with blonde hair, even though Gosseen had reported that the man who robbed him had dark brown hair. She argued that photographs 1, 3, and 5 (the photographs in the left hand column of the lineup) were the blondes, leaving only photographs 2, 4, and 6 as potential suspects. Of these three photographs, Trial Counsel noted that the person in photograph number 6 had light brown, not dark brown, hair and that the person in photograph number 2 was heavy, not thin. As a result, according to Trial Counsel, the only viable photograph for Gosseen to pick was photograph number 4. Trial counsel also argued that the person in photograph number 4 was the only person in the photo lineup with obvious facial hair above the lip.

With respect to James's review of the photo lineup, Trial Counsel noted that James reportedly knew Mitchell, a blonde, and of course easily picked Mitchell from the line-up. As with Gosseen, of the remaining five photographs, the only person who was thin and with dark hair was the person in photograph number 4—Conrick.

The trial court overruled the Motion, finding that it did not believe the photo-

6. The record suggests that during this interview, Hopkins implicated Conrick and Mitchell. Hopkins later recanted this statement. Hopkins did not testify at Conrick's trial, and the jury did not hear direct testimony that Hopkins implicated Conrick, or later recanted his implication of Conrick. The jury heard only that Hopkins was interviewed and that after the interview, a photo lineup including Conrick's picture was prepared, suggesting a connection between the two events.

graphs in the photo lineup to be "so dissimilar that it would justify suppression of the photo ID."

As we have noted, a trial court's ruling on a motion to suppress is reversed only if it is clearly erroneous. *Foster*, 348 S.W.3d at 161. " 'The trial court's ruling is clearly erroneous if we are left with a definite and firm belief a mistake has been made.' " *Hunter*, 43 S.W.3d at 340 (quoting *State v. Leavitt*, 993 S.W.2d 557, 560 (Mo. App. W.D.1999)). " 'In reviewing the trial court's ruling on a motion to suppress, the facts and any reasonable inferences arising therefrom are to be viewed in a light most favorable to the ruling of the trial court.' " *Id.* (quoting *State v. Carter*, 955 S.W.2d 548, 560 (Mo. banc 1997)).

Here, the trial court's ruling reflects the trial court's belief that Conrick failed to sustain his burden to establish that the photo lineup was unduly suggestive, the first step in the two-step analysis. We cannot conclude on the record made at the Motion hearing that the trial court clearly erred.

Our review of the photo lineup supports the trial court's conclusion. All six photographs are of young white men, likely in their 20's. All have short hair. It is true that three of the six have hair that is blonde, or apparently dyed blonde. However, two of the three blondes have obvious dark roots. The other three men have brown hair. Though one of these three has hair that is lighter than the other two, it is not so light as to fall obviously out of the category of "dark brown." The relative weights of the six individuals are remarkably different. And we observe that in any event, no evidence was elicited from Strahm about the reported weight or build of the man who robbed Gosseen, other than the man's height. Although it was less than ideal to have included *any* photos of young men with blonde or partially

blonde hair in the lineup, or to have included both Mitchell and Conrick's photographs in the lineup, we cannot conclude that the photo array was ***unduly*** suggestive as a result. *See Hunter*, 43 S.W.3d at 341 (holding that photo lineup was not unduly suggestive where the defendant's photo was the only one that included his name) (citing *State v. Walker*, 755 S.W.2d 404, 407 (Mo.App. E.D.1988) (holding that a photo lineup was not unduly suggestive where the defendant's photo had a pink, smooth wall background and all other photos had a light blue, concrete wall background); *State v. Hadley*, 736 S.W.2d 580, 591 (Mo.App. S.D.1987) (holding that a photo lineup was not unduly suggestive where the photos of four of five persons were shown full-face and in profile, while the photos of the defendant included two full-face images)).

We recognize that in each of the aforesaid cases, the defendant argued a lineup was unduly suggestive because of a difference in the physical display of the photos in the lineup, and not because of a variation in the physical characteristics of those featured in the lineup. However, an identical outcome has been reached in cases where dissimilar physical characteristics were relied upon to claim that a lineup was unduly suggestive. In *State v. Floyd*, 347 S.W.3d 115 (Mo.App. E.D.2011), the defendant complained that a photo lineup was unduly suggestive because he "was the most light-complected person depicted." *Id.* at 125. The Eastern District did not find clear error in the trial court's denial of the defendant's motion to suppress. *Id.* The court's discussion is instructive:

Dissimilarity in physical appearance, alone, is insufficient to establish impermissible suggestion. Because courts normally only require the police to use reasonable efforts to find physically similar participants in a photo lineup, differ-

ences in age, weight, height, hairstyle, and other physical characteristics do not compel a finding of impermissible suggestiveness. Since only identical twins can be identical in a lineup and *as long as no one individual clearly stands out in the lineup,* the law does not require exact conformity to ensure an untainted identification procedure. Police are only required to find physically similar participants, even if a defendant has a physical abnormality or very distinctive appearance, as no lineup in that type of situation can be expected to provide subjects reasonably close in appearance.

*Id.* at 125–26 (internal quote marks and citations omitted) (emphasis added). The Eastern District concluded that despite the variance in complexions, the photo lineup was not unduly suggestive because all six persons were of the same race, general age, and with similar hairstyles. *Id.* at 126.

Similarly, in *State v. Williams,* 18 S.W.3d 425 (Mo.App. S.D.2000), the Southern District did not find clear error in a trial court's denial of a motion to suppress a photo lineup as unduly suggestive. In *Williams,* the court noted that in a photo lineup containing six photographs, each person was a white male wearing glasses. *Id.* at 432. Four had hair that appeared to be darker that the defendant's. *Id.* One had hair that appeared to be lighter. *Id.* The six were of various ages, though none appeared to be elderly or adolescent. *Id.* None of the six appeared to have a unique characteristic that would distinguish him. *Id.*

In *State v. Allen,* 274 S.W.3d 514 (Mo. App. W.D.2008), this court rejected a defendant's claim that a photo lineup was unduly suggestive despite the use of "filler" photographs with facial hair, hair color, and background color dissimilar from the defendant's photograph. *Id.* at 525. We held that " 'a lineup is not impermissibly suggestive simply because the individuals in the lineup have different physical characteristics.' " *Id.* (quoting *State v. Cosby,* 976 S.W.2d 464, 468 (Mo.App. E.D. 1998)).

■ There is simply no precedent requiring exact replication of every physical characteristic of a suspect in a photo lineup. In fact, the reverse is true. "A lineup does not require exact conformity, the disparity in a feature or two ... does not invalidate the array as impermissibly suggestive." *State v. Hayes,* 624 S.W.2d 488, 489 (Mo.App. W.D.1981). In this case, though there is some dissimilarity amongst those depicted in the photo lineup, there is also similarity. We cannot conclude based on our review of the photo lineup and the record made at the hearing that Conrick clearly stood out in the lineup. *Floyd,* 347 S.W.3d at 125. We cannot conclude that the presence of three blondes in the photo lineup rendered the lineup unduly suggestive. The trial court did not clearly error in overruling the Motion.

Of course, the trial court's ruling on the Motion was interlocutory, and independently preserved nothing for appellate review. *State v. Wolf,* 91 S.W.3d 636, 642 (Mo.App. W.D.2002). However, because results from the photo lineup were later admitted at trial over timely objection, we must next consider the evidence presented both at the suppression hearing and at trial to determine whether the Motion (and the objections at trial) should have been granted. *State v. Goff,* 129 S.W.3d 857, 861–62 (Mo. banc 2004) (citations omitted).

### Evidence and Objections at Trial

Conrick's case was tried on May 5–6, 2011. Trial Counsel renewed her objection to any reference to the photo lineup at the beginning of trial "for the reasons as

stated in the [Motion]." The objection was overruled, and the photo lineup was admitted into evidence prior to opening statements.

The first witness to testify was James. He testified that he saw two men in the early afternoon of August 4, 2009 outside his window in an area of the senior apartment complex where people should not be. The area permitted the men a clear view of Gosseen's apartment. James watched the men for two to three minutes then went outside and confronted them. They told James they had been looking for someone who was not home, and turned and walked away.

James described the two men he confronted as "two white Caucasians. One was slighter than the other, blonde-headed or real light-headed, and had a baseball hat on. The other was a little bit on the heavier side, had very close-cut hair, had a mustache and beard—or goatee type." James further testified the two men were in their twenties, and that both were near his height—five foot ten inches tall. James reported that he had a clear view of both men. James could *not* testify as to whether either of the men he saw was present in the courtroom. James explained that he had developed macular degeneration sometime after the August 4, 2009 incident and was going blind. Thus, James did not make an in-court identification of Conrick.

James did testify, however, about his pretrial identification of the two men he had seen in the area on the day of the robbery. James heard about the robbery on August 5, 2009. He went over to talk to Gosseen. James stated that Gosseen "indicated this gentleman had robbed him and described him, and that was the same man that I had seen the day before." James did not elaborate about which of the two men he was referring to, and was not asked during direct examination to share the description of the robber given to him by Gosseen. As a result of his discussion with Gosseen, James did later speak with the police.

James claimed that he spoke with the police on either the 5th or 6th of August, and that they asked him to "look at some pictures. . . . Both pictures were there." Contrary to Strahm's testimony during the hearing on the Motion, James testified that he did not know either of the men he confronted. When shown the photo lineup, James generally identified it as "some of them pictures they showed me." He testified that although the photo lineup included pictures he was shown, it did not include all of the pictures he was shown. He also testified that he was not shown the lineup in the form introduced into evidence and that all he was ever shown were loose pictures.

When asked nonetheless during direct examination to point out on the photo lineup the two men whose loose pictures he had earlier identified, James pointed to photograph number 3 (Mitchell) and photograph number 6 (Hopkins). James did not identify Conrick's photograph on the photo lineup. However, he was quick to add that his oncoming blindness made it difficult for him to be sure that he was pointing to the same photographs he had previously identified. James testified that he was certain that the loose photographs he identified for the police a day or two after the robbery were the two men he confronted. James's testimony did not draw a connection between the photographs he previously identified and Conrick.

James was asked about his earlier deposition testimony. He acknowledged that during his deposition he had identified whoever was sitting next to Trial Counsel as one of the men he saw on August 4,

2009. However, he could not testify that the person he identified at his deposition was Conrick.

James's testimony, such as it was, came in over Trial Counsel's overruled objections. James did not provide an in-court identification of Conrick, and did not testify that he had identified Conrick out-of-court.

On cross-examination, and contrary to Strahm's testimony during the Motion hearing, James testified that when he spoke to officers a day or two after the robbery, he *never* spoke with a female officer and only spoke with two male officers. He testified that it was his understanding that a female officer was speaking to Gosseen at the same time the male officers were speaking with him. When asked if Gosseen had described the man who robbed him, James testified that Gosseen told him that "the man had a goatee and dark-haired ... [and] that the man was wearing a cap." To confirm the point, Trial Counsel asked, "So he told you that it was a dark-haired man with a goatee wearing a cap?" James responded "That's correct." James testified that he only met with the police one time on the occasion when he was shown loose pictures a day or two after the robbery.

The State next called Detective Nicholas Neill ("Neill"), a detective with the Clinton County Sheriff's Department. Neill identified Strahm as his partner within the department. Neill testified that after the robbery, he participated in an interview of Hopkins, a person of interest. After this interview, he and Strahm took a photo lineup to Gosseen and James. At this point, Trial Counsel renewed her objection to any testimony about the lineup based on "the reasons stated in the motion to suppress." The objection, made continuing with the consent of the trial court, was overruled.

Neill testified that both Gosseen and James were shown the photo lineup on the same day, which he believed to be August 11, 2009. When asked if loose photos were shown to James, Neill testified "I don't believe so." Instead, he testified that James was shown the photo lineup, and that the lineup had been prepared by him and Strahm. Neill identified the photo lineup in evidence as the photo lineup shown to Gosseen and James. The State was granted permission to publish the photo lineup to the jury over Trial Counsel's overruled objection that the lineup was unduly suggestive.

Neill then testified that Gosseen identified photograph number 4 (Conrick) as the man who robbed him. Without elaborating, Neill also testified that Gosseen "recognized more than one person" in the lineup. Though this was likely because Mitchell, the housekeeper's son, was in the lineup, no further explanation was afforded to the jury. Neill testified that Gosseen seemed sure of his identification, though he looked at the photo lineup for a minute or two.

Neill then testified that James identified photographs number 3 and number 4 as the men he confronted in the area. Neill testified that photograph number 4 was Conrick. He did not testify about the identity of the person in photograph number 3. Neill testified that James seemed very certain of his identifications which he made in about 15 or 20 seconds.

On cross-examination, Neill admitted that the three photographs in the left column of the lineup were "all blonde or red-haired ... none of them have dark brown hair." He also admitted that the three photographs in the right column of the line up showed men with brown hair, though the top two men had dark brown hair, and the bottom man had medium brown hair.

Neill admitted that when he was creating the photo lineup, he knew that Gosseen had reported that the man who robbed him had dark hair and a pencil mustache.

The State then called Strahm to the stand. She described her initial interview with Gosseen. She testified that her follow up investigation involved an interview with Hopkins, after which a photo lineup including Conrick's picture was prepared. She testified that she and Neill then took the lineup to James and Gosseen. Strahm identified the lineup in evidence as the photo lineup presented to James and Gosseen. Once again Trial Counsel objected to any further testimony about the photo lineup on the basis that it was unduly suggestive. The objection was overruled with the grant of a continuing objection.

When asked if other photographs were shown to James, Strahm replied "I don't believe so." Strahm stated that although she was present, Neill actually presented the photo lineup to James, and asked James if he recognized any of the gentlemen he had seen on August 4th. Strahm testified that James pointed to photographs number 3 (Mitchell) and number 4 (Conrick). Strahm also testified that James did not look at the lineup for very long.

Strahm then testified that the same lineup was presented to Gosseen, who was asked by her whether "he could identify the subject that walked into his house." Strahm testified that Gosseen pointed out photograph number 4 (Conrick). She noted that Gosseen looked at the lineup "for a while" before making his identification. Her impression was that Gosseen "felt pretty confident."

On cross-examination, Strahm confirmed that photograph number 3 was Mitchell and that photograph number 6 was Hopkins. She admitted that in her initial interview of Gosseen, he told her that the man who robbed him was a younger white male with dark hair and a pencil mustache. She claimed that Gosseen told her the man was "five foot plus" and slender.[7]

In discussing the photo lineup, Strahm admitted that none of the individuals in the left column have dark hair, and that Hopkins's hair (photograph number 6) is medium brown. Strahm admitted that a couple of months after Gosseen's initial identification of Conrick from the photo lineup, Gosseen asked to see "a later photograph" of Conrick. Strahm took a single photograph of Conrick to Gosseen. That photograph was not, however, placed in the investigation file, and thus was not in evidence.

On redirect examination, Strahm testified that Gosseen's mind was not changed about the identification of the man who robbed him when he was shown a photograph of Conrick a few months after the photo lineup.

On recross-examination, Strahm testified generally about the creation of photo lineups.

Q: And when you are creating a photo lineup, you are attempting to put in pictures in that line up that look like the suspect person that—or look like—that match the identifiers that the individual you spoke to gave you, correct?

A: Correct.

Q: So if he said that the person had dark hair, you would—the people would have dark hair, correct?

A: Correct.

---

7. Recall that in Strahm's testimony during the hearing on the Motion, she did not testify about a reported weight or build of the sus-

pect, and noted that her report did not include this information.

. . . .

Q: So the point of putting the pictures in is to put in pictures of people that look like the person that the suspect—that the person said was a suspect, right?

A: Yes.

Strahm also testified again about the second picture of Conrick shown to Gosseen. Strahm stated the picture was Conrick's booking picture, and that it was shown to Gosseen at Gosseen's request "several months" after the photo lineup. Strahm did not know why Gosseen had asked to see another picture of Conrick, and could not say whether it was in connection with an upcoming court appearance.

The State then presented the testimony of Gosseen by video tape deposition taken about two months prior to trial. Gosseen was unable to testify at trial for medical reasons. In addition to the testimony about the robbery set out in the factual summary, *supra*, Gosseen described the man who robbed him as approximately the same height and weight as Gosseen. Gosseen testified that he was five feet seven and a half or eight inches tall, and that at the time of the robbery he weighed about 155 pounds. He testified the man was "maybe a little heavier. It happened very quickly, and it's been almost two years ago." Gosseen also testified that the man had a pencil mustache, and that it appeared the man's hair had been recently cut. Gosseen described the pistol as a small automatic weapon that was three to four inches long. He did not believe it to be a revolver, and he was unsure of its caliber, explaining he was "nervous with the situation," and "didn't stare at the barrel."

When Gosseen was asked to *describe* the man who robbed him, Gosseen replied "They're that person sitting right there." At trial, Trial Counsel objected to this testimony before it was played as nonresponsive, and on the basis stated in the Motion. The trial court overruled the objections. Trial Counsel was afforded a continuing objection to any testimony by Gosseen relating to identification of Conrick. The jury then heard Gosseen's proclamation pointing out an unidentified person in the deposition room as the man who robbed him. Later in the deposition, Gosseen again testified that the person "sitting right there" was the man who robbed him. This time, the State made a record that the person Gosseen was pointing to was Conrick, who was (apparently) present during the deposition.[8]

Gosseen testified that the police responded to his apartment after the robbery. Gosseen testified that "[m]aybe as fast as the next day," the police "brought out a couple different types of photos for me to—to look at." Gosseen was then shown the photo lineup. When asked to identify the exhibit, Gosseen responded:

A: Well, it's some photos of several different people.

Q: Have you seen any of those photos before?

A: Yes, it appears I have.

Q: Do you recall where you have seen those photos before?

A: I believe the police brought those out to me, detectives.

Q: Is that the photo—those are the photos the police officers showed you; is that correct?

8. The State's identification of Conrick as the person Gosseen was pointing to during his deposition was not objected to in the deposition. The video camera did not film Conrick at anytime during the deposition. However, the deposition transcript, which was received into evidence as an exhibit, indicates that Conrick was in attendance.

A: Yes, as far as I'm rec—recollect, you bet.

Q: And did the police officers ask you any questions about those photos?

A: Yeah, they asked if I could identify anyone on there that would—as the person that may have robbed me.

Q: And did anyone on there look like the person that robbed you?

A: Right there.

Q: Are you pointing to what is labeled on this as No. 6?

A: Yes.

Gosseen did not clearly testify that the photo lineup was presented to him in the form offered at trial. In fact, his testimony indicated that he had seen "a couple of different types of photographs."

During cross-examination, Gosseen acknowledged that he told police that the man who robbed him was white, in his 20's, had a "relatively short" haircut, and was over five feet five. Gosseen acknowledged that he told the police that the man had "brown hair. He sure didn't have blonde hair." Gosseen acknowledged that he told the police the man had a small pencil mustache, as if "you took an eyebrow pencil and didn't have no mustache and put little marks under it, it—and looks like a person who was trying to grow a mustache or actually penciled one on their—their mouth." Gosseen had no recollection of telling the police that the man who robbed him was slender. Gosseen acknowledged that his encounter with the robber lasted less than a minute.

Gosseen also testified during cross-examination that he did not see any tattoos on the man who robbed him, and that he did not notice anything unusual about the

man's face or teeth [9] other than the mustache. He testified that the man was not wearing a hat. Gosseen testified that when he was shown the photo lineup, he was thinking that he needed to "pick out someone from this group of people," based on the single time he saw the man who robbed him.

Gosseen briefly described his contact with his neighbor, James, the day after the robbery. Gosseen said that he recalled James "describing a person, you know, to me, but before I even described him, same description."

On redirect examination, the prosecutor clarified Gosseen's discussion of the photo lineup. Gosseen acknowledged that the exhibit shows six photographs, arranged with two on the top, two in the middle and two on the bottom. Gosseen clarified that the photograph he had identified during his direct examination was located in the middle of the right column. Gosseen acknowledged that the number 4 appears above this picture and the number 6 below, thus explaining his incorrect identification of the photograph he had pointed to during direct examination as photograph number 6 when it was in fact photograph number 4.

The State rested following the playing of Gosseen's deposition video. Trial Counsel moved for a judgment of acquittal. The trial court correctly pointed out that "there wasn't any identification of [Conrick] in open court here," and could not recall for sure whether Gosseen sufficiently identified Conrick in his videotaped deposition. After taking a break to consider the matter, the trial court overruled Conrick's motion for judgment of acquittal at the close

9. Trial Counsel established through Strahm's testimony that when Conrick was arrested, three to four days after he was identified by Gosseen and James, she noticed he was miss-

ing a tooth. However, no evidence ever established that Conrick was missing a tooth on the day of the robbery.

of the State's evidence. Conrick put on no evidence, and his renewed motion for judgment of acquittal at the close of the evidence was overruled.

We assess whether the trial court erroneously admitted the pretrial identification of Conrick by James and Gosseen for an abuse of discretion. *Foster*, 348 S.W.3d at 161. Beyond the evidence elicited during the hearing on the Motion, very little additional evidence was elicited at trial relevant to assessing whether the photo lineup was unduly suggestive, the first step in the analysis.[10] Strahm did admit that a photo lineup should generally include all dark haired individuals if the suspect has been described as dark haired. This concession about preferred police procedure does not, however, equate with the standard for reaching the legal conclusion that the photo lineup was "unduly suggestive." We have already explained in our discussion of the applicable case law on the subject, *supra*, that " 'a lineup is not impermissibly suggestive simply because the individuals in the lineup have different physical characteristics.' " *Allen*, 274 S.W.3d at 525 (quoting *Cosby*, 976 S.W.2d at 468).

It is true that the trial testimony of Neill and Strahm was inconsistent with the testimony of James and Gosseen about whether the photo lineup was even shown to either man. However, this inconsistency, (which was ignored by Trial Counsel), does not further Conrick's argument that the photo lineup was unduly suggestive. In fact, the suggestive nature of the lineup is rendered an immaterial issue if the lineup in the form admitted at trial was never actually shown to James or Gosseen.

In short, Conrick did not sustain his burden to establish the first step to securing exclusion of a pretrial identification—that the photo lineup was unduly suggestive. The trial court was thus permitted (barring other unasserted objections to admissibility) to admit James's and Gosseen's pretrial identifications and any subsequent in-court identifications[11] without considering whether the suggestive procedures created a substantial likelihood that the identification was unreliable—the second step to securing exclusion of a pretrial identification. *Hunter*, 43 S.W.3d at 340 (quoting *Glover*, 951 S.W.2d at 362).

Though Conrick did not establish that the photo lineup was unduly suggestive, negating any need to determine whether the identifications were inherently unreliable due to suggestive procedures, and

**10.** On appeal, Conrick argues for the first time that the photo lineup was unduly suggestive because it "pair[ed] him in a lineup with a suspect known to be present at Gosseen's apartment," referring to the fact three blondes appeared in the left column of the line-up, and three brown haired individuals in the right column, with Mitchell's picture in the middle of the left column immediately next to Conrick's picture in the right hand column. As James testified that he saw one blonde and one dark haired man on the afternoon of the robbery, and as Gosseen testified that Mitchell had been at his apartment on the morning of the robbery, Conrick argues in his brief that the positioning of Conrick's picture next to Mitchell was suggestive. This argument was not made, however, by Conrick in his Motion or during trial, permitting at best plain error review of the additional claim. *Foster*, 348 S.W.3d at 161. We do not believe the relative positioning of the photographs in the lineup establishes "substantial grounds for believing that manifest injustice or miscarriage of justice" exists. *Id.* (quotation omitted). We note, for example, that James, when first shown the photo lineup at trial (according to his testimony), selected photographs number 3 and number 6 (Mitchell and Hopkins), not photographs number 3 and number 4 (Mitchell and Conrick).

**11.** Recall that James was unable to make an in-court identification of Conrick, and that Gosseen's "in-court" identification of Conrick was made in a deposition.

though Conrick was thus unsuccessful in securing *the exclusion* of the photo lineup or in-court identifications from evidence, nothing prevented Conrick from independently arguing that James's and Gosseen's identifications were not reliable—a credibility determination for the jury to make. "Absent a showing of police suggestiveness ... questions as to the reliability of the evidence or the witness go to the weight of the evidence." *State v. Body*, 366 S.W.3d 625, 632–33 (Mo.App. E.D.2012). Here, there was ample material at Conrick's disposal to call into question the reliability of the pretrial and/or in-court identifications. Conrick was free to argue that the identifications by James and Gosseen were unreliable, "and the jury was free to believe or disbelieve the evidence" about the identifications. *Id.* at 633.

Though the evidence identifying Conrick as the person who robbed Gosseen is not impressive in its weight or consistency, "[t]he verdict indicates that the jury was persuaded by the State's identification evidence." *Id.* More to the point, the sufficiency of the evidence to convict Conrick and/or the submissibility of the case given the thin reed of an in-court identification provided by Gosseen in his videotaped deposition, have not been raised as issues on appeal.

### Conclusion

The trial court's judgment is affirmed.

All concur.